# METROPOLITAN LIFE INSURANCE CO. *v.* MASSACHUSETTS

No. 84–325.   Argued February 26, 1985—Decided June 3, 1985*

---

*Together with No. 84–356, *Travelers Insurance Co.* v. *Massachusetts,* also on appeal from the same court.

BLACKMUN, J., delivered the opinion of the Court, in which all other Members joined, except POWELL, J., who took no part in the decision of the cases.

*Jay Greenfield* argued the cause for appellant in No. 84–325. With him on the briefs was *Peter Buscemi.* *Lane McGovern* argued the cause for appellant in No. 84–356. With him on the brief was *Steven A. Kaufman.*

*Sally A. Kelly,* Assistant Attorney General of Massachusetts, argued the cause for appellee in both cases. With her on the brief were *Francis X. Bellotti,* Attorney General, and *Susan M. Roberts,* Assistant Attorney General.†

---

† Briefs of *amici curiae* urging reversal were filed for the American Federation of Labor and Congress of Industrial Organizations by *David M. Silberman, Marsha Berzon,* and *Laurence Gold;* for the Blue Cross and Blue Shield Association by *Philip S. Neal;* for the ERISA Industry Committee by *John M. Vine* and *Arvid E. Roach II;* for the Health Insurance Association of America by *Roger D. Redden* and *John P. Dineen;* for the International Brotherhood of Electrical Workers Local 421 Health and Welfare Fund et al. by *David L. Nixon;* for the National Coordinating Committee for Multiemployer Plans by *Gerald M. Feder;* and for Milton R. Hill et al. by *James H. Clarke.*

Briefs of *amici curiae* urging affirmance were filed for the State of Connecticut et al. by *Joseph I. Lieberman,* Attorney General of Connecticut, *Elliot F. Gerson,* Deputy Attorney General, *Arnold B. Feigin, Jonathon L. Ensign, John G. Haines, Richard T. Sponzo,* and *Robert E. Walsh,* Assistant Attorneys General, and by the Attorneys General of their respective States as follows: *John K. Van de Kamp* of California, *Robert T. Stephan* of Kansas, *William J. Guste, Jr.,* of Louisiana, *James E. Tierney* of Maine, *Stephen H. Sachs* of Maryland, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Mike Greely* of Montana, *Irwin I. Kimmelman* of New Jersey, *Paul G. Bardacke* of New Mexico, *Robert Abrams* of New York, *Lacy H. Thornburg* of North Carolina, *Nicholas Spaeth* of North Dakota, *T. Travis Medlock* of South Carolina, *Jeffrey L. Amestoy* of Vermont, *Bronson C. La Follette* of Wisconsin, and *Gerald L. Baliles* of Virginia; for the State of Oregon by *Dave Frohnmayer,* Attorney General, *William F. Gary,* Deputy Attorney

JUSTICE BLACKMUN delivered the opinion of the Court.

A Massachusetts statute requires that specified minimum mental-health-care benefits be provided a Massachusetts resident who is insured under a general insurance policy, an accident or sickness insurance policy, or an employee health-care plan that covers hospital and surgical expenses. The first question before us in these cases is whether the state statute, as applied to insurance policies purchased by employee health-care plans regulated by the federal Employee Retirement Income Security Act of 1974, is pre-empted by that Act. The second question is whether the state statute, as applied to insurance policies purchased pursuant to negotiated collective-bargaining agreements regulated by the National Labor Relations Act, is pre-empted by the labor Act.

I

A

General health insurance typically is sold as group insurance to an employer or other group.[1] Group insurance presently is subject to extensive state regulation, including

General, *James E. Mountain, Jr.*, Solicitor General, *Virginia L. Linder*, Assistant Solicitor General, and *Kathleen G. Dahlin*, Assistant Attorney General; for the National Conference of State Legislatures et al. by *Joyce Holmes Benjamin* and *Lawrence R. Velvel;* for the American Chiropractic Association by *Harry N. Rosenfield;* for the American Optometric Association by *Ellis Lyons, Bennett Boskey*, and *Edward A. Groobert;* for the American Psychiatric Association et al. by *Joel I. Klein;* for the American Psychological Association et al. by *Donald N. Bersoff* and *Bruce J. Ennis;* for the American Public Health Association et al. by *Bruce H. Schneider* and *Herbert Semmel;* for the Committee for Comprehensive Insurance Coverage by *Edward A. Scallet;* and for the National Association of Alcoholism Treatment Programs, Inc., by *Paul L. Perito* and *Frederick H. Graefe.*

[1] See Health Insurance Association of America, 1982–1983 Source Book of Health Insurance Data 4–7 (1984 Update). Group health insurance is provided either by commercial insurance companies or service corporations such as Blue Cross-Blue Shield. *Ibid.*

regulation of the carrier, regulation of the sale and advertising of the insurance, and regulation of the content of the contracts.[2] Mandated-benefit laws, that require an insurer to provide a certain kind of benefit to cover a specified illness or procedure whenever someone purchases a certain kind of insurance, are a subclass of such content regulation.

While mandated-benefit statutes are a relatively recent phenomenon,[3] statutes regulating the substantive terms of insurance contracts have become commonplace in all 50 States over the last 30 years.[4] Perhaps the most familiar are those regulating the content of automobile insurance policies.[5]

---

[2] Laws regulating the insurer include, for example, those governing solvency or the qualification of management. Laws regulating aspects of transacting the business of group insurance include, for example, those regulating claims practices or rates. Finally, laws regulating the content of group policies include, in addition to the mandated-benefit statutes under consideration here, those requiring the policies to provide grace periods and conversion privileges. See Brummond, Federal Preemption of State Insurance Regulation Under ERISA, 62 Iowa L. Rev. 57, 81–84, 101 (1976). All three varieties of regulation are common. *Ibid.*

[3] The first mandated-benefit statutes regulating terms in group-health insurance appeared in 1971 and 1972, prior to the enactment of the federal Employee Retirement Income Security Act of 1974. See, *e. g.*, Ariz. Rev. Stat. Ann. § 20–1402(4)(b) (1975) (enacted 1971); Conn. Gen. Stat. § 38–174d (Supp. 1985) (enacted 1971); Ill. Rev. Stat., ch. 73, ¶ 979(7) (Supp. 1984–1985) (enacted 1972); 1971 Wis. Laws, ch. 325 (superseded).

[4] See Brummond, 62 Iowa L. Rev., at 82–84, 101. In particular, there are a wide variety of longstanding statutes that mandate that insurance contracts contain certain provisions. See, *e. g.*, *New York Life Ins. Co.* v. *Hardison*, 199 Mass. 190, 85 N. E. 410 (1908) (upholding statute prescribing provisions); Md. Ann. Code, Art. 48A, § 410(a)(5) (1979) (law enacted in 1956 mandating the inclusion of a clause in a life insurance policy that limits the exclusion from coverage for death by suicide to that occurring within two years of the issuance of the policy).

[5] See, *e. g.*, *California Automobile Assn. Inter-Insurance Bureau* v. *Maloney*, 341 U. S. 105 (1951) (upholding state statute requiring insurers to participate in a mandatory assigned-risk pool to assure the availability of automobile insurance). Like most States, Massachusetts at present

The substantive terms of group-health insurance contracts, in particular, also have been extensively regulated by the States. For example, the majority of States currently require that coverage for dependents continue beyond any contractually imposed age limitation when the dependent is incapable of self-sustaining employment because of mental or physical handicap; such statutes date back to the early 1960's.[6] And over the last 15 years all 50 States have required that coverage of infants begin at birth, rather than at some time shortly after birth, as had been the prior practice in the unregulated market.[7] Many state statutes require that insurers offer on an optional basis particular kinds of coverage to purchasers.[8] Others require insurers either to offer or mandate that insurance policies include coverage for services rendered by a particular type of health-care provider.[9]

Mandated-benefit statutes, then, are only one variety of a matrix of state laws that regulate the substantive content of health-insurance policies to further state health policy. Massachusetts Gen. Laws Ann., ch. 175, § 47B (West Supp. 1985), is typical of mandated-benefit laws currently in place in the majority of States.[10] With respect to a Massachusetts

---

mandates both the kinds of automobile policies insurers must offer to sell and the kinds of coverage insureds may purchase. See Mass. Gen. Laws Ann., ch. 175, § 113A *et seq.* (West 1972 and Supp. 1985).

[6] See App. to Brief for American Public Health Association et al. as *Amici Curiae* A7–A10 (APHA brief) (listing state statutes). See, *e. g.,* Mass. Gen. Laws Ann., ch. 175, § 108.2(a)(3) (West 1972) (enacted in 1962).

[7] See App. to APHA brief 1A–6A (listing statutes).

[8] There are approximately 50 such laws in over 20 States. See App. to Brief for Health Insurance Association of America as *Amicus Curiae* in Support of Juris. Statements 1a–2a (listing statutes).

[9] For example, a majority of States require that coverage for services offered by an optometrist be either mandated or at least offered in a health-insurance plan. See *id.,* at 4a (listing statutes).

[10] According to the Health Insurance Association of America, 26 States have promulgated 69 mandated-benefit laws. See *id.,* at 1a–2a; see also

resident, it requires any general health-insurance policy that provides hospital and surgical coverage, or any benefit plan that has such coverage, to provide as well a certain minimum of mental-health protection. In particular, § 47B requires that a health-insurance policy provide 60 days of coverage for confinement in a mental hospital, coverage for confinement in a general hospital equal to that provided by the policy for nonmental illness, and certain minimum outpatient benefits.[11]

---

*Wayne Chemical, Inc.* v. *Columbus Agency Service Corp.*, 426 F. Supp. 316, 324, n. 8 (ND Ill.) (citing statutes in 26 States), aff'd as modified, 567 F. 2d 692 (CA7 1977).

Different States mandate a great variety of different kinds of insurance coverage. For example, many require alcoholism coverage, see Conn. Gen. Stat. § 38-262b (Supp. 1985), while others require certain birth-defect coverage, see Md. Ann. Code, Art. 48A, § 477X (Supp. 1984), outpatient kidney-dialysis coverage, see Ohio Rev. Code Ann. § 3923.25 (Supp. 1984), or reconstructive surgery for insured mastectomies, see Ariz. Rev. Stat. Ann. § 20-1402(5) (Supp. 1984-1985).

[11] Section 47B reads:

"Any blanket or general policy of insurance . . . or any policy of accident and sickness insurance . . . or any employees' health and welfare fund which provides hospital expense and surgical expense benefits and which is promulgated or renewed to any person or group of persons in this commonwealth . . . shall, provide benefits for expense of residents of the commonwealth covered under any such policy or plan, arising from mental or nervous conditions as described in the standard nomenclature of the American Psychiatric Association which are at least equal to the following minimum requirements:

"*(a)* In the case of benefits based upon confinement as an inpatient in a mental hospital . . . the period of confinement for which benefits shall be payable shall be at least sixty days in any calender year . . . .

"*(b)* In the case of benefits based upon confinement as an inpatient in a licensed or accredited general hospital, such benefits shall be no different than for any other illness.

"*(c)* In the case of out-patient benefits, these shall cover, to the extent of five hundred dollars over a twelve-month period, services furnished (1) by a comprehensive health service organization, (2) by a licensed or accredited hospital (3) or subject to the approval of the department of mental health services furnished by a community mental health center or other mental

Section 47B was designed to address problems encountered in treating mental illness in Massachusetts. The Commonwealth determined that its working people needed to be protected against the high cost of treatment for such illness. It also believed that, without insurance, mentally ill workers were often institutionalized in large state mental hospitals, and that mandatory insurance would lead to a higher incidence of more effective treatment in private community mental-health centers. See Massachusetts General Court, Joint Committee on Insurance, Advances in Health Insurance in Massachusetts (1974), reprinted in App. 426, 430–432.

In addition, the Commonwealth concluded that the voluntary insurance market was not adequately providing mental-health coverage, because of "adverse selection" in mental-health insurance: good insurance risks were not purchasing coverage, and this drove up the price of coverage for those who otherwise might purchase mental-health insurance. The legislature believed that the public interest required that it correct the insurance market in the Commonwealth by mandating minimum-coverage levels, effectively forcing the good-risk individuals to become part of the risk pool, and enabling insurers to price the insurance at an average market rather than a market retracted due to adverse selection. See Findings of Fact of the Superior Court, App. to Juris. Statement in No. 84–325, pp. 50a–53a. Section 47B, then, was intended to help safeguard the public against the high costs of comprehensive inpatient and outpatient mental-health care, reduce nonpsychiatric medical-care expenditures for mentally related illness, shift the delivery of treatment from inpatient to outpatient services, and relieve the Commonwealth of some of the financial burden it otherwise would encounter with respect to mental-health problems. *Ibid.*

---

health clinic or day care center which furnishes mental health services or (4) consultations or diagnostic or treatment sessions . . . ."

It is our task in these cases to decide whether such insurance regulation violates or is inconsistent with federal law.

## B

The federal Employee Retirement Income Security Act of 1974, 88 Stat. 829, as amended, 29 U. S. C. § 1001 *et seq.* (ERISA), comprehensively regulates employee pension and welfare plans. An employee welfare-benefit plan or welfare plan is defined as one which provides to employees "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability [or] death," whether these benefits are provided "through the purchase of insurance or otherwise." § 3(1), 29 U. S. C. § 1002(1). Plans may self-insure or they may purchase insurance for their participants. Plans that purchase insurance—so-called "insured plans"— are directly affected by state laws that regulate the insurance industry.

ERISA imposes upon pension plans a variety of substantive requirements relating to participation, funding, and vesting. §§ 201–306, 29 U. S. C. §§ 1051–1086. It also establishes various uniform procedural standards concerning reporting, disclosure, and fiduciary responsibility for both pension and welfare plans. §§ 101–111, 401–414, 29 U. S. C. §§ 1021–1031, 1101–1114. It does not regulate the substantive content of welfare-benefit plans. See *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 91 (1983).

ERISA thus contains almost no federal regulation of the terms of benefit plans. It does, however, contain a broad pre-emption provision declaring that the statute shall "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." § 514(a), 29 U. S. C. § 1144(a). Appellant Metropolitan in No. 84–325 argues that ERISA pre-empts Massachusetts' mandated-benefit law insofar as § 47B restricts the kinds of insurance policies that benefit plans may purchase.

While § 514(a) of ERISA broadly pre-empts state laws that relate to an employee-benefit plan, that pre-emption is substantially qualified by an "insurance saving clause," § 514(b)(2)(A), 29 U. S. C. § 1144(b)(2)(A), which broadly states that, with one exception, nothing in ERISA "shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." The specified exception to the saving clause is found in § 514(b)(2)(B), 29 U. S. C. § 1144(b)(2)(B), the so-called "deemer clause," which states that no employee-benefit plan, with certain exceptions not relevant here, "shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies." Massachusetts argues that its mandated-benefit law, as applied to insurance companies that sell insurance to benefit plans, is a "law which regulates insurance," and therefore is saved from the effect of the general pre-emption clause of ERISA.

Wholly apart from the question whether Massachusetts' mandated-benefit law is pre-empted by ERISA, appellant Travelers in No. 84–356 argues that as applied to benefit plans negotiated pursuant to collective-bargaining agreements, § 47B is pre-empted by the National Labor Relations Act, 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.* (NLRA), because it effectively imposes a contract term on the parties that otherwise would be a mandatory subject of collective bargaining. Unlike ERISA, the NLRA contains no statutory provision indicating the extent to which it was intended to pre-empt state law. Resolution of the NLRA pre-emption question, therefore, requires us to discern legislative intent from the general purpose of the NLRA, and not from any particular statutory language.

## II

Appellants are Metropolitan Life Insurance Company and Travelers Insurance Company (insurers) who are located in New York and Connecticut respectively and who issue group-health policies providing hospital and surgical coverage to plans, or to employers or unions that employ or represent employees residing in Massachusetts. Under the terms of § 47B, both appellants are required to provide minimal mental-health benefits in policies issued to cover Commonwealth residents.

In 1979, the Attorney General of Massachusetts brought suit in Massachusetts Superior Court for declaratory and injunctive relief to enforce § 47B. The Commonwealth asserted that since January 1, 1976, the effective date of § 47B, the insurers had issued policies to group policyholders situated outside Massachusetts that provided for hospital and surgical coverage for certain residents of the Commonwealth. App. 8–9. It further asserted that those policies failed to provide Massachusetts-resident beneficiaries the mental-health coverage mandated by § 47B, and that the insurers intended to issue more such policies, believing themselves not bound by § 47B for policies issued outside the Commonwealth. In their answer, the insurers admitted these allegations.[12]

The complaint further asserted that the insurers had amended a number of policies in effect prior to January 1, 1976, but had failed to include the benefits mandated by § 47B in the amended policies, in violation of the law. App. 9–10. Finally, the Commonwealth asserted that the insurers refused to provide the mandated benefits in part on the ground that they believed ERISA and the NLRA pre-empted § 47B. App. 10. Though the insurers had not actually refused to provide the mandated benefits in any policy issued after January 1, 1976, within the Commonwealth, the insurers preserved their right to challenge the applicability of § 47B

---

[12] See Answer ¶¶ 8–14, App. 51–52. See also Stipulation ¶¶ 1–11, App. 459–462.

to any policy issued to an ERISA plan within the Commonwealth.[13]   The Commonwealth accordingly requested broad preliminary and permanent injunctive relief, asking the court to require the insurers to provide the mandated benefits to all covered residents of the Commonwealth subject to the terms of § 47B, regardless of when their policies were issued or whether they were presently receiving such benefits. App. 11–12.

The Superior Court issued a preliminary injunction requiring the insurers to provide the coverage mandated by § 47B. App. 57–59.   After trial, a different judge issued a permanent injunction to the same effect, see App. to Juris. Statement in No. 84–325, pp. 67a–70a, making extensive findings of fact concerning the cost, nature, purpose, and effect of the mandated-benefit law.   See *id.*, at 36a–62a.   The Supreme Judicial Court of Massachusetts granted the insurers' application for direct appellate review and affirmed the judgment of the Superior Court.   *Attorney General* v. *Travelers Ins. Co.*, 385 Mass. 598, 433 N. E. 2d 1223 (1982).

Addressing first the ERISA pre-emption question, the court recognized that § 47B is a law that "'relate[s] to' benefit plans," and so would be pre-empted unless it fell within one of the exceptions to the pre-emption clause of ERISA. 385 Mass., at 605, 433 N. E. 2d, at 1227.   The court went on to hold, however, that § 47B is a law "which regulates insurance," as understood by the ERISA saving clause, § 514(b)(2)(A), 29 U. S. C. § 1144(b)(2)(A), and therefore is not pre-empted by ERISA.   385 Mass., at 606–609, 433 N. E. 2d, at 1228–1230.[14]   It rejected appellants' claim that

---

[13] See Answer to the Complaint, Second and Third Defenses, App. 53–54. See also Stipulation ¶ 9, App. 461–462.

[14] Section 47B also requires benefit plans that are self-insured to provide the mandated mental-health benefits.   In light of ERISA's "deemer clause," § 514(b)(2)(B), 29 U. S. C. § 1144(b)(2)(B), which states that a benefit plan shall not "be deemed an insurance company" for purposes of the insurance saving clause, Massachusetts has never tried to enforce § 47B as applied to benefit plans directly, effectively conceding that such an

the saving clause was designed to save only "traditional" insurance laws rather than those that are designed to promote public health, finding no such limitation in the statutory language of ERISA. The court nonetheless was wary of a literal reading of the statute, lest the saving clause give the States unintended authority to regulate in areas otherwise governed by ERISA. It therefore understood the saving clause to save only state laws that were unrelated to the substantive provisions of ERISA. Since nothing in ERISA regulates the content of welfare plans, state regulation of insurance that indirectly affects the content of welfare plans is not pre-empted by ERISA. 385 Mass., at 606–607, 609, 433 N. E. 2d, at 1228–1229.

The court then went on to conclude that the NLRA does not pre-empt § 47B. Although § 47B regulates health benefits, a subject of mandatory collective bargaining, the NLRA does not pre-empt all local regulation affecting employment relations. A public health statute, § 47B does not regulate labor-management relations as such or affect the free play of economic forces between labor and management. "It is unlikely that Congress intended, by enacting the NLRA, to bind the hands of State Legislatures with respect to problems such as mental health." 385 Mass., at 613, 433 N. E. 2d, at 1232.

Moreover, the court pointed out, Congress has indicated in the McCarran-Ferguson Act, 59 Stat. 33, as amended, 15 U. S. C. § 1011 et seq., that federal laws should not be construed to supersede state laws "regulating the business of insurance." § 1012(b). Section 47B operates upon insurance and insurance policies. The McCarran-Ferguson Act

application of § 47B would be pre-empted by ERISA's pre-emption clause, § 514(a), 29 U. S. C. § 1144(a). See Stipulation ¶ 12, App. 462. In a part of its decision that is not challenged here, the Supreme Judicial Court held that that part of § 47B which applies to insurers is severable from the pre-empted provisions pertaining directly to benefit plans. See 385 Mass., at 601–602, 433 N. E. 2d, at 1225.

contains no limiting definition of the term "business of insurance" that would suggest a narrow reading excluding §47B from its protection. 385 Mass., at 613–614, 433 N. E. 2d, at 1232. The court therefore found no pre-emption under either ERISA or the NLRA.

On appeal, this Court, 463 U. S. 1221 (1983), vacated the judgment of the Supreme Judicial Court and remanded the cases for further consideration in light of the intervening decision in *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85 (1983). Appropriately refocusing on the ERISA pre-emption provisions that were the subject of that decision, the Supreme Judicial Court, with one justice dissenting, reinstated its former judgment. *Attorney General* v. *Travelers Ins. Co.*, 391 Mass. 730, 463 N. E. 2d 548 (1984). The court reasoned that this Court had not addressed the insurance exception in *Shaw*, and as that decision construed none of the exceptions listed in §514(b), our statement that the exceptions were "narrow" was merely dictum that did not compel the Massachusetts court to change its result. 391 Mass., at 733, 463 N. E. 2d, at 550. Unlike the exemption from ERISA coverage at issue in *Shaw*, the exception in §514(b) is phrased very broadly. Nor was there reason to alter the limiting construction given the saving clause. The Court in *Shaw* held that ERISA's broad pre-emption provision was intended to pre-empt any state law that "relate[d] to" an employee-benefit plan, not merely those state laws that directly conflicted with a substantive provision in the federal statute. Though the Court thus had rejected a conflict-based analysis of the broadly phrased pre-emption clause as being too narrow an interpretation of that provision, it did not follow that the conflict-based limitation on the saving clause imposed by the Supreme Judicial Court similarly should be rejected.

The dissenting justice felt that the *Shaw* Court had made clear that the exemptions and exceptions to ERISA's pre-emption clause should be read narrowly in order to preserve nationwide uniformity in the administration of welfare plans.

Reading the insurance saving clause narrowly, § 47B should not be understood as a statute that regulates insurance. As applied, § 47B concerns health benefits that an employer must provide, and only incidentally regulates insurance. *Shaw* established that it is "irrelevant whether State law dictating plan benefits conflicts with the substantive policies of ERISA." 391 Mass., at 736, 463 N. E. 2d, at 552.

The insurers once again appealed pursuant to 28 U. S. C. § 1257(2), and we noted probable jurisdiction. 469 U. S. 929 (1984).[15]

## III

"In deciding whether a federal law pre-empts a state statute, our task is to ascertain Congress' intent in enacting the federal statute at issue. 'Pre-emption may be either express or implied, and "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones* v. *Rath Packing Co.*, 430 U. S. 519, 525 (1977).' *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta*, 458 U. S. 141, 152–153 (1982)." *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S., at 95. The narrow statutory ERISA question presented is whether Mass. Gen. Laws Ann., ch. 175, § 47B (West Supp. 1985), is a law "which regulates insurance" within the meaning of § 514(b)(2)(A), 29 U. S. C. § 1144(b)(2)(A), and so would not be pre-empted by § 514(a).

---

[15] Metropolitan, in its appeal No. 84–325, concerns itself with that part of the judgment that found no pre-emption under ERISA, while Travelers, in its appeal No. 84–356, separately emphasizes the part of the judgment that found no pre-emption under the NLRA. This division apparently was a tactical choice; the record indicates that both appellants have issued insurance contracts to plans that are the product of collective-bargaining agreements subject to the NLRA, and that "[v]irtually all" insurance policies issued by both appellants to cover Massachusetts employees were issued to provide benefits for plans subject to ERISA. Most contracts technically were issued to employers. See Stipulation, ¶¶ 8, 11, 12, App. 461–462. We consolidated the appeals when we noted probable jurisdiction. 469 U. S. 929 (1984).

## A

Section 47B clearly "relate[s] to" welfare plans governed by ERISA so as to fall within the reach of ERISA's pre-emption provision, § 514(a). The broad scope of the pre-emption clause was noted recently in *Shaw* v. *Delta Air Lines, Inc.*, *supra*, where we held that the New York Human Rights Law and that State's Disability Benefits Law "relate[d] to" welfare plans governed by ERISA. The phrase "relate to" was given its broad common-sense meaning, such that a state law "relate[s] to" a benefit plan "in the normal sense of the phrase, if it has a connection with or reference to such a plan." 463 U. S., at 97. The pre-emption provision was intended to displace all state laws that fall within its sphere, even including state laws that are consistent with ERISA's substantive requirements. *Id.*, at 98–99. "[E]ven indirect state action bearing on private pensions may encroach upon the area of exclusive federal concern." *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U. S. 504, 525 (1981).

Though § 47B is not denominated a benefit-plan law, it bears indirectly but substantially on all insured benefit plans, for it requires them to purchase the mental-health benefits specified in the statute when they purchase a certain kind of common insurance policy. The Commonwealth does not argue that § 47B as applied to policies purchased by benefit plans does not relate to those plans, and we agree with the Supreme Judicial Court that the mandated-benefit law as applied relates to ERISA plans and thus is covered by ERISA's broad pre-emption provision set forth in § 514(a).

## B

Nonetheless, the sphere in which § 514(a) operates was explicitly limited by § 514(b)(2). The insurance saving clause preserves any state law "which regulates insurance, banking, or securities." The two pre-emption sections, while clear enough on their faces, perhaps are not a model of legislative drafting, for while the general pre-emption clause broadly

pre-empts state law, the saving clause appears broadly to preserve the States' lawmaking power over much of the same regulation. While Congress occasionally decides to return to the States what it has previously taken away, it does not normally do both at the same time.[16]

Fully aware of this statutory complexity, we still have no choice but to "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc.* v. *Dollar Park and Fly, Inc.*, 469 U. S. 189, 194 (1985). We also must presume that Congress did not intend to pre-empt areas of traditional state regulation. See *Jones* v. *Rath Packing Co.*, 430 U. S. 519, 525 (1977).

To state the obvious, § 47B regulates the terms of certain insurance contracts, and so seems to be saved from preemption by the saving clause as a law "which regulates insurance." This common-sense view of the matter, moreover, is reinforced by the language of the subsequent subsection of ERISA, the "deemer clause," which states that an employee-benefit plan shall not be deemed to be an insurance company "for purposes of any law of any State purporting to regulate insurance companies, *insurance contracts*, banks, trust com-

---

[16] Long aware of this problem, commentators have recommended that Congress amend the pre-emption provisions to clarify its intentions. See, *e. g.*, Manno, ERISA Preemption and the McCarran-Ferguson Act: The Need for Congressional Action, 52 Temp. L. Q. 51 (1979); Okin, Preemption of State Insurance Regulation by ERISA, 13 A. B. A. Forum 652, 678 (1978). Congress, too, is aware of the problem. A bill was introduced in 1979 to amend ERISA to provide that state mandated-benefit statutes are not preserved by the insurance saving clause. See S. 209, 96th Cong., 1st Sess., 125 Cong. Rec. 933, 937 (1979). The bill was intended to overrule the decision in *Wadsworth* v. *Whaland*, 562 F. 2d 70 (CA1 1977), cert. denied, 435 U. S. 980 (1978), holding that the saving clause saved a New Hampshire mandated-benefit law. See 125 Cong. Rec. 947 (1979) (remarks of Sen. Javits). The bill was reported to the Senate, but died without being debated. See Senate Committee on Labor and Human Resources, 96th Cong., Legislative Calendar 108, 111 (final ed., Jan. 4, 1981).

panies, or investment companies." § 514(b)(2)(B), 29 U. S. C. § 1144(b)(2)(B) (emphasis added). By exempting from the saving clause laws regulating insurance contracts that apply directly to benefit plans, the deemer clause makes explicit Congress' intention to include laws that regulate insurance contracts within the scope of the insurance laws preserved by the saving clause. Unless Congress intended to include laws regulating insurance contracts within the scope of the insurance saving clause, it would have been unnecessary for the deemer clause explicitly to exempt such laws from the saving clause when they are applied directly to benefit plans.

The insurers nonetheless argue that § 47B is in reality a health law that merely operates on insurance contracts to accomplish its end, and that it is not the kind of traditional insurance law intended to be saved by § 514(b)(2)(A). We find this argument unpersuasive.

Initially, nothing in § 514(b)(2)(A), or in the "deemer clause" which modifies it, purports to distinguish between traditional and innovative insurance laws. The presumption is against pre-emption, and we are not inclined to read limitations into federal statutes in order to enlarge their preemptive scope. Further, there is no indication in the legislative history that Congress had such a distinction in mind.

Appellants assert that state laws that directly regulate the insurer, and laws that regulate such matters as the way in which insurance may be sold, are traditional laws subject to the clause, while laws that regulate the substantive terms of insurance contracts are recent innovations more properly seen as health laws rather than as insurance laws, which § 514(b)(2)(A) does not save. This distinction reads the saving clause out of ERISA entirely, because laws that regulate only the insurer, or the way in which it may sell insurance, do not "relate to" benefit plans in the first instance. Because they would not be pre-empted by § 514(a), they do not need to be "saved" by § 514(b)(2)(A). There is no indication that Congress could have intended the saving clause to operate

only to guard against too expansive readings of the general pre-emption clause that might have included laws wholly unrelated to plans.[17]  Appellants' construction, in our view, violates the plain meaning of the statutory language and renders redundant both the saving clause it is construing, as well as the deemer clause which it precedes, and accordingly has little to recommend it.[18]

Moreover, it is both historically and conceptually inaccurate to assert that mandated-benefit laws are not traditional insurance laws.  As we have indicated, state laws regulating the substantive terms of insurance contracts were commonplace well before the mid-70's, when Congress considered ERISA.[19]  The case law concerning the meaning of the phrase "business of insurance" in the McCarran-Ferguson Act, 15 U. S. C. § 1011 *et seq.*, also strongly supports the conclusion that regulation regarding the substantive terms of

---

[17] In light of the fact that the saving clause was in place well before the general pre-emption clause was amended to pre-empt broadly all laws that relate to plans, such an explanation is unacceptable.  See n. 23, *infra*.

[18] Nearly every court that has addressed the question has concluded that laws regulating the substantive content of insurance contracts are laws that regulate insurance and thus are within the scope of the insurance saving clause.  See, *e. g., Wayne Chemical, Inc.* v. *Columbus Agency Service Corp.*, 567 F. 2d 692, 700 (CA7 1977); *Wadsworth* v. *Whaland*, 562 F. 2d, at 77; *Eversole* v. *Metropolitan Life Ins. Co.*, 500 F. Supp. 1162, 1168–1170 (CD Cal. 1980); *Insurers' Action Council, Inc.* v. *Heaton*, 423 F. Supp. 921, 926 (Minn. 1976); *Insurance Comm'r* v. *Metropolitan Life Ins. Co.*, 296 Md. 334, 344–345, 463 A. 2d 793, 798 (1983); *Metropolitan Life Ins. Co.* v. *Whaland*, 119 N. H. 894, 900–902, 410 A. 2d 635, 639–640 (1979).  Cf. *American Progressive Life and Health Ins. Co.* v. *Corcoran*, 715 F. 2d 784, 787 (CA2 1983).  But see *Michigan United Food & Commercial Workers Union* v. *Baerwaldt*, 572 F. Supp. 943 (ED Mich. 1983), appeal docketed, No. 83–1570 (CA6 1983).

[19] See nn. 2–6, *supra*.  See also, *e. g., Hoopeston Canning Co.* v. *Cullen*, 318 U. S. 313, 321 (1943) (States have "full power to prescribe the forms of contract [and] the terms of protection of the insured"); *California Automobile Assn. Inter-Insurance Bureau* v. *Maloney*, 341 U. S. 105 (1951); *Insurance Comm'r* v. *Metropolitan Life Ins. Co.*, 296 Md., at 340, 463 A. 2d, at 796 (citing cases).  See Manno, 52 Temp. L. Q., at 56.

insurance contracts falls squarely within the saving clause as laws "which regulate insurance."

Cases interpreting the scope of the McCarran-Ferguson Act have identified three criteria relevant to determining whether a particular practice falls within that Act's reference to the "business of insurance": *first,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry." *Union Labor Life Ins. Co.* v. *Pireno,* 458 U. S. 119, 129 (1982) (emphasis in original). See also *Group Life & Health Ins. Co.* v. *Royal Drug Co.,* 440 U. S. 205 (1979). Application of these principles suggests that mandated-benefit laws are state regulation of the "business of insurance."

Section 47B obviously regulates the spreading of risk: as we have indicated, it was intended to effectuate the legislative judgment that the risk of mental-health care should be shared. See Findings of Fact of the Superior Court, App. to Juris. Statement in No. 84–325, pp. 50a–51a. It is also evident that mandated-benefit laws directly regulate an integral part of the relationship between the insurer and the policyholder by limiting the type of insurance that an insurer may sell to the policyholder. Finally, the third criterion is present here, for mandated-benefit statutes impose requirements only on insurers, with the intent of affecting the relationship between the insurer and the policyholder. Section 47B, then, is the very kind of regulation that this Court has identified as a law that relates to the regulation of the business of insurance as defined in the McCarran-Ferguson Act:[20]

"Congress was concerned [in the McCarran-Ferguson Act] with the type of state regulation that centers

---

[20] See also 91 Cong. Rec. 480 (1945) (remarks of Sen. Ferguson) ("A state law relating to . . . the fixing of the terms of a contract of insurance . . . would be permitted [under the McCarran-Ferguson Act]").

around the contract of insurance . . . . The relationship between insurer and insured, *the type of policy which could be issued*, its reliability, its interpretation, and enforcement—these were the core of the 'business of insurance.' [T]he focus [of the statutory term] was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the 'business of insurance.'" *SEC* v. *National Securities, Inc.*, 393 U. S. 453, 460 (1969) (emphasis added).

Nor is there any contrary case authority suggesting that laws regulating the terms of insurance contracts should *not* be understood as laws that regulate insurance. In short, the plain language of the saving clause, its relationship to the other ERISA pre-emption provisions, and the traditional understanding of insurance regulation, all lead us to the conclusion that mandated-benefit laws such as § 47B are saved from pre-emption by the operation of the saving clause.[21]

---

[21] That mandated-benefit laws fall within the terms of the definition of insurance in the McCarran-Ferguson Act is directly relevant in another sense as well. Congress' "primary concern" in enacting McCarran-Ferguson was to "ensure that the States would continue to have the ability to tax and regulate the business of insurance." *Group Life & Health Ins. Co.* v. *Royal Drug Co.*, 440 U. S. 205, 217–218 (1979). That Act provides: "The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." 59 Stat. 34, 15 U. S. C. § 1012(a). The ERISA saving clause, with its similarly worded protection of "any law of any State which regulates insurance," appears to have been designed to preserve the McCarran-Ferguson Act's reservation of the business of insurance to the States. The saving clause and the McCarran-Ferguson Act serve the same federal policy and utilize similar language to define what is left to the States. Moreover, § 514(d) of ERISA, 29 U. S. C. § 1144(d), explicitly states in part: "Nothing in [ERISA] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States." Thus application of the McCarran-Ferguson Act lends further support to

Nothing in the legislative history of ERISA suggests a different result. There is no discussion in that history of the relationship between the general pre-emption clause and the saving clause, and indeed very little discussion of the saving clause at all.[22] In the early versions of ERISA, the general pre-emption clause pre-empted only those state laws dealing with subjects regulated by ERISA. The clause was significantly broadened at the last minute, well after the saving clause was in its present form, to include all state laws that relate to benefit plans. The change was made with little explanation by the Conference Committee, and there is no indication in the legislative history that Congress was aware of the new prominence given the saving clause in light of the rewritten pre-emption clause, or was aware that the saving clause was in conflict with the general pre-emption provision.[23] There is a complete absence of evidence that Con-

---

our ruling that Congress did not intend mandated-benefit laws to be preempted by ERISA.

[22] The Conference Committee Report merely stated: "The preemption provisions of title I are not to exempt any person from any State law that regulates insurance." H. R. Conf. Rep. No. 93–1280, p. 383 (1974).

[23] See *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 98–99, and nn. 18–20 (1983). The insurance saving clause appeared in its present form in bills introduced in 1970 that led to ERISA. See S. 3589, 91st Cong., 2d Sess., § 14, 116 Cong. Rec. 7284 (1970). The pre-emption clause apparently was broadened out of a fear that "state professional associations" would otherwise hinder the development of such employee-benefit programs as "prepaid legal service programs." See 120 Cong Rec. 29197 (1974) (remarks of Rep. Dent); *id.*, at 29933 (remarks of Sen. Williams); *id.*, at 29949 (remarks of Sen. Javits). There is no suggestion that the pre-emption provision was broadened out of any concern about state regulation of insurance contracts, beyond a general concern about "potentially conflicting State laws." See *id.*, at 29942 (remarks of Sen. Javits).

The Conference Committee that was convened to work out differences between the Senate and House versions of ERISA broadened the general pre-emption provision from one that pre-empted state laws only insofar as they regulated the same areas explicitly regulated by ERISA, to one that pre-empts all state laws unless otherwise saved. See H. R. Conf. Rep. No. 93–1280, p. 383 (1974). The change gave the insurance saving clause

gress intended the narrow reading of the saving clause suggested by appellants here. Appellants do call to our attention a few passing references in the record of the floor debate to the "narrow" exceptions to the pre-emption clause,[24] but these are far too frail a support on which to rest appellants' rather unnatural reading of the clause.

We therefore decline to impose any limitation on the saving clause beyond those Congress imposed in the clause itself and in the "deemer clause" which modifies it. If a state law "regulates insurance," as mandated-benefit laws do, it is not pre-empted. Nothing in the language, structure, or legislative history of the Act supports a more narrow reading of the clause, whether it be the Supreme Judicial Court's attempt to save only state regulations unrelated to the substantive pro-

---

a much more significant role, as a provision that saved an entire body of law from the sweeping general pre-emption clause. There were no comments on the floor of either Chamber specifically concerning the insurance saving clause, and hardly any concerning the exceptions to the pre-emption clause in general. See n. 24, *infra*.

The change in the pre-emption provision was not disclosed until the Report was filed with Congress 10 days before final action was taken on ERISA. The House conferees filed their Report, H. R. Conf. Rep. No. 93–1280, on August 12, 1974, while the Senate conferees filed their Report, S. Conf. Rep. No. 93–1090, the following day. 30 Cong. Q. Almanac 252 (1974). ERISA was passed by the House on August 20, and by the Senate on August 22. 120 Cong. Rec. 29215–29216, 29963 (1974).

[24] See *id.*, at 29197 (remarks of Rep. Dent) ("narrow exceptions specifically enumerated"); *id.*, at 29933 (remarks of Sen. Williams) ("narrow exceptions specified in the bill . . . eliminating the threat of conflicting or inconsistent State and local regulation"). See also *id.*, at 29942 (remarks of Sen. Javits) (avoiding danger of "potentially conflicting State laws hastily contrived"). We have previously made reference to these comments in *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S., at 99, 105, finding them "not particularly illuminating," but lending support to our conclusion that the exception in § 514(d) should not be given an artificially broad construction. 463 U. S., at 104. We agree with the Supreme Judicial Court that our understanding of § 514(d) in *Shaw* is of little help in analyzing § 514(b)(2)(A), for, unlike § 514(d), the saving clause is broad on its face and specific in its reference.

visions of ERISA, or the insurers' more speculative attempt to read the saving clause out of the statute.

We are aware that our decision results in a distinction between insured and uninsured plans, leaving the former open to indirect regulation while the latter are not. By so doing we merely give life to a distinction created by Congress in the "deemer clause," a distinction Congress is aware of and one it has chosen not to alter.[25] We also are aware that appellants' construction of the statute would eliminate some of the disuniformities currently facing national plans that enter into local markets to purchase insurance. Such disuniformities, however, are the inevitable result of the congressional decision to "save" local insurance regulation. Arguments as to the wisdom of these policy choices must be directed at Congress.

## IV

### A

Unlike ERISA, the NLRA contains no statutory pre-emption provision. Still, as in any pre-emption analysis, "'[t]he purpose of Congress is the ultimate touchstone.'" *Malone* v. *White Motor Corp.*, 435 U. S. 497, 504 (1978), quoting *Retail Clerks* v. *Schermerhorn*, 375 U. S. 96, 103 (1963). Where the pre-emptive effect of federal enactments is not explicit, "courts sustain a local regulation 'unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circum-

---

[25] A 1977 Activity Report of the House Committee on Education and Labor recognized the difference in treatment between insured and non-insured plans: "To the extent that [certain programs selling insurance policies] fail to meet the definition of an 'employee benefit plan' [subject to the "deemer clause"], state regulation of them is not preempted by section 514, even though such state action is barred with respect to the plans which purchase these 'products.'" H. R. Rep. No. 94–1785, p. 48. A bill to amend the saving clause to specify that mandated-benefit laws are preempted by ERISA was reported to the Senate in 1981 but was not acted upon. See n. 16, *supra*.

stances that Congress sought to occupy the field to the exclusion of the States.'" *Allis-Chalmers Corp.* v. *Lueck, ante,* at 209, quoting *Malone* v. *White Motor Corp.,* 435 U. S., at 504.

Appellants contend first that because mandated-benefit laws require benefit plans whose terms are arrived at through collective bargaining to purchase certain benefits the parties may not have wished to purchase, such laws in effect mandate terms of collective-bargaining agreements. The Supreme Judicial Court of Massachusetts correctly found that "[b]ecause a plan that purchases insurance has no choice but to provide mental health care benefits, the insurance provisions of § 47B effectively control the content of insured welfare benefit plans." 385 Mass., at 605, 433 N. E. 2d, at 1227. More precisely, faced with § 47B, parties to a collective-bargaining agreement providing for health insurance are forced to make a choice: either they must purchase the mandated benefit, decide not to provide health coverage at all, or decide to become self-insured, assuming they are in a financial position to make that choice.

The question then becomes whether this kind of interference with collective bargaining is forbidden by federal law. Appellants argue that because Congress intended to leave the choice of terms in collective-bargaining agreements to the free play of economic forces, not subject either to state law or to the control of the National Labor Relations Board (NLRB), mandated-benefit laws should be pre-empted by the NLRA.

The Court has articulated two distinct NLRA pre-emption principles. The so-called *Garmon* rule, see *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959), protects the primary jurisdiction of the NLRB to determine in the first instance what kind of conduct is either prohibited or protected by the NLRA.[26] There is no claim here that

---

[26] See *Belknap, Inc.* v. *Hale,* 463 U. S. 491, 498–499 (1983). *Garmon* pre-emption involves balancing the State's interest in controlling or rem-

Massachusetts has sought to regulate or prohibit any conduct subject to the regulatory jurisdiction of the NLRB, since the Act is silent as to the substantive provisions of welfare-benefit plans.

A second pre-emption doctrine protects against state interference with policies implicated by the structure of the Act itself, by pre-empting state law and state causes of action concerning conduct that Congress intended to be unregulated. The doctrine was designed, at least initially, to govern pre-emption questions that arose concerning activity that was neither arguably protected against employer interference by §§ 7 and 8(a)(1) of the NLRA, nor arguably prohibited as an unfair labor practice by § 8(b) of that Act. 29 U. S. C. §§ 157, 158(a)(1) and (b). Such action falls outside the reach of *Garmon* pre-emption. See *New York Telephone Co.* v. *New York Labor Dept.*, 440 U. S. 519, 529–531 (1979) (plurality opinion).[27]

edying the effects of the conduct in question against the interference with the Board's ability to adjudicate controversies committed to it by the Act, and the risk that the State will sanction conduct that the Act protects. *Ibid.* *Garmon* pre-emption accomplishes Congress' purpose of creating an administrative agency in charge of creating detailed rules to implement the Act, rather than having the Act enforced and interpreted by the state or federal courts. *San Diego Building Trades Council* v. *Garmon*, 359 U. S., at 241–245.

[27] Such analysis initially had been used to determine whether certain weapons of bargaining neither protected by § 7 nor forbidden by § 8(b) could be subject to state regulation. See, *e. g.*, *Belknap, Inc.* v. *Hale*, *supra* (power to terminate replacements hired during a strike); *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S. 132 (1976) (concerted refusal to work overtime). It has been used more recently to determine the validity of state rules of general application that affect the right to bargain or to self-organization. See *New York Telephone Co.* v. *New York Labor Dept.*, 440 U. S., at 539–540 (plurality opinion) (state unemployment compensation laws).

Such pre-emption does not involve in the first instance a balancing of state and federal interests, see *Brown* v. *Hotel Employees*, 468 U. S. 491, 502–503 (1984), but an analysis of the structure of the federal labor law to determine whether certain conduct was meant to be unregulated. An

In *Teamsters* v. *Morton*, 377 U. S. 252 (1964), the Court struck down an Ohio labor law that prohibited a type of secondary boycott neither prohibited nor protected under the NLRA. The Court ruled that if state law were allowed to deprive the union of a self-help weapon permitted under federal law, "the inevitable result would be to frustrate the congressional determination to leave this weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy." *Id.*, at 260. Similarly, in *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S. 132 (1976), the Court ruled that a State may not penalize a concerted refusal to work overtime that was neither prohibited nor protected under the NLRA, for "Congress intended that the conduct involved be unregulated because left 'to be controlled by the free play of economic forces.'" *Id.*, at 140, quoting *NLRB* v. *Nash-Finch Co.*, 404 U. S. 138, 144 (1971).

More recently, a divided Court struggled with a feature of New York's unemployment-insurance law that provided certain unemployment-insurance payments to striking workers. *New York Telephone Co.* v. *New York Labor Dept., supra.* As in *Machinists* and *Morton*, the state law "altered the economic balance between labor and management." 440 U. S., at 532 (plurality opinion). A majority of the Justices nonetheless found the state law not pre-empted, on the ground that the legislative history of the Social Security Act of 1935, along with other federal legislation, suggested that Congress had decided to permit a State to pay unemployment benefits to strikers.[28]

---

appreciation of the State's interest in regulating a certain kind of conduct may still be relevant in determining whether Congress in fact intended the conduct to be unregulated. See *New York Telephone Co.* v. *New York Labor Dept.*, 440 U. S., at 539–540.

[28] A plurality opinion affirmed the state-court decision finding no preemption in part on the ground that the 1935 Congress intended to permit the States to make these payments, and in part on the ground that the unemployment insurance statute was a law of general application designed to

These cases rely on the understanding that in providing in the NLRA a framework for self-organization and collective bargaining, Congress determined both how much the conduct of unions and employers should be regulated, and how much it should be left unregulated:

> "The States have no more authority than the Board to upset the balance that Congress has struck between labor and management in the collective-bargaining relationship. 'For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits.'" *New York Telephone Co.* v. *New York Labor Dept.*, 440 U. S., at 554 (dissenting opinion), quoting *Garner* v. *Teamsters*, 346 U. S. 485, 500 (1953).

All parties correctly understand this case to involve *Machinists* pre-emption.

## B

Here, however, appellants do not suggest that § 47B alters the balance of power between the parties to the labor contract. Instead, appellants argue that, not only did Congress establish a balance of bargaining power between labor and management in the Act, but it also intended to prevent the States from establishing minimum employment standards that labor and management would otherwise have been required to negotiate from their federally protected bargaining positions, and would otherwise have been permitted to set at a lower level than that mandated by state law. Appellants assert that such state regulation is permissible only when Congress has authorized its enactment. Because welfare benefits are a mandatory subject of bargaining under the

---

insure employment security in the State, and not to regulate the bargaining relationship between management and labor. *Id.*, at 532–533. Two opinions concurring in the result agreed with the plurality on only the legislative history ground. See *id.*, at 546 and 547.

labor law, see *Chemical & Alkali Workers* v. *Pittsburgh Plate Glass Co.*, 404 U. S. 157, 159, and n. 1 (1971), and because Congress has never given States the authority to enact health regulations that affect the terms of bargaining agreements, appellants urge that the NLRA pre-empts any state attempt to impose minimum-benefit terms on the parties.[29]

Appellants assume that Congress' ultimate concern in the NLRA was in leaving the parties free to reach agreement about contract terms. The framework established in the NLRA was merely a means to allow the parties to reach such agreement fairly. A law that interferes with the end result of bargaining is, therefore, even worse than a law that interferes with the bargaining process. Thus, it is argued, this case is *a fortiori* to cases like *Morton, Machinists,* and *New York Telephone.*

The question has been before the Court in the past, see *Algoma Plywood Co.* v. *Wisconsin Board*, 336 U. S. 301, 312 (1949), and there is a surface plausibility to appellants' argument, which finds support in dicta in some prior Court deci-

---

[29] Even if we were to accept appellants' argument that state laws mandating contract terms on collectively bargained contracts are pre-empted unless Congress authorizes their imposition, we would still find § 47B not pre-empted here. For mandated-benefit laws are laws "regulating the business of insurance," see n. 21, *supra,* and Congress in the McCarran-Ferguson Act expressly left to the States the power to enact such regulation. 15 U. S. C. § 1012(a). That Act states: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." § 1012(b). Appellants argue that § 1012(a) does not apply to the NLRA because of § 1014, which states: "Nothing contained in this chapter shall be construed to affect in any manner the application to the business of insurance of the . . . National Labor Relations Act." The federal laws excepted from the operation of § 1012(b), however, are listed in that subsection itself. Section § 1014 was meant, instead, to codify this Court's decision in *Polish National Alliance* v. *NLRB*, 322 U. S. 643 (1944), which held that the labor relations of insurance companies are subject to the NLRA. See, e. g., 91 Cong. Rec. 1090 (1945) (remarks of Rep. Gwynne); 90 Cong. Rec. 6419 (1944) (remarks of Rep. Allen); *id.,* at 6526 (remarks of Rep. Brehm).

sions. See *Teamsters* v. *Oliver*, 358 U. S. 283, 295–296 (1959); *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U. S., at 525–526. Upon close analysis, however, we find that *Morton, Machinists*, and *New York Telephone* all rest on a sound understanding of the purpose and operation of the Act that is incompatible with appellants' position here.

## C

Congress apparently did not consider the question whether state laws of general application affecting terms of collective-bargaining agreements subject to mandatory bargaining were to be pre-empted.[30] That being so, "the Court must construe the Act and determine its impact on state law in light of the wider contours of federal labor policy." *Belknap, Inc.* v. *Hale*, 463 U. S. 491, 520, n. 4 (1983) (opinion concurring in judgment).

The NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment, and not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions. See Cox, Recent Developments in Federal Labor Law Preemption, 41 Ohio St. L. J. 277, 297 (1980). The NLRA's declared purpose is to remedy "[t]he inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association." § 1, 29 U. S. C. § 151. The same section notes the desirability of "restoring

---

[30] We have found no relevant legislative history on the specific question. The right to bargain collectively was only gradually understood to include the right to bargain about each subject that the Board found to be comprehended by the phrase "wages, hours and other terms and conditions of employment." § 8(d), 29 U. S. C. § 158(d). Thus, Congress could not easily have anticipated the claim that a state labor standard would be pre-empted as a result of the right to bargain. See Cox & Seidman, Federalism and Labor Relations, 64 Harv. L. Rev. 211, 242 (1950).

equality of bargaining power," among other ways, "by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."

One of the ultimate goals of the Act was the resolution of the problem of "depress[ed] wage rates and the purchasing power of wage earners in industry," 29 U. S. C. § 151, and "the widening gap between wages and profits," 79 Cong. Rec. 2371 (1935) (remarks of Sen. Wagner), thought to be the cause of economic decline and depression.[31]  Congress hoped to accomplish this by establishing procedures for more equitable private bargaining.

The evil Congress was addressing thus was entirely unrelated to local or federal regulation establishing minimum terms of employment.  Neither inequality of bargaining power nor the resultant depressed wage rates were thought to result from the choice between having terms of employment set by public law or having them set by private agreement.  No incompatibility exists, therefore, between federal rules designed to restore the equality of bargaining power, and state or federal legislation that imposes minimal substantive requirements on contract terms negotiated between parties to labor agreements, at least so long as the purpose of

---

[31] "It is well recognized today that the failure to spread adequate purchasing power among the vast masses of the consuming public disrupts the continuity of business operations and causes everyone to suffer.  The piling up of excess capital reserves and plant capacities is a dead weight upon the whole economic structure. . . .

      •       •       •       •

"[Under the new program] [e]mployees were guaranteed protection in their cooperative efforts, in order that they might help the Government to insure a sufficient flow of purchasing power through adequate wages." Hearings on S. 1958 before the Senate Committee on Education and Labor, 74th Cong., 1st Sess., 34–35 (1935) (statement of Sen. Wagner).

the state legislation is not incompatible with these general goals of the NLRA.

Accordingly, it never has been argued successfully that minimal labor standards imposed by other *federal* laws were not to apply to unionized employers and employees. See, *e. g., Barrentine* v. *Arkansas-Best Freight System, Inc.*, 450 U. S. 728, 737, 739 (1981). Cf. *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, 51 (1974). Nor has Congress ever seen fit to exclude unionized workers and employers from laws establishing federal minimal employment standards. We see no reason to believe that for this purpose Congress intended state minimum labor standards to be treated differently from minimum federal standards.

Minimum state labor standards affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA. Nor do they have any but the most indirect effect on the right of self-organization established in the Act. Unlike the NLRA, mandated-benefit laws are not laws designed to encourage or discourage employees in the promotion of their interests collectively; rather, they are in part "designed to give specific minimum protections to *individual* workers and to ensure that *each* employee covered by the Act would receive" the mandated health insurance coverage. *Barrentine*, 450 U. S., at 739 (emphasis in original). Nor do these laws even inadvertently affect these interests implicated in the NLRA. Rather, they are minimum standards "independent of the collective-bargaining process [that] devolve on [employees] as individual workers, not as members of a collective organization." *Id.*, at 745.

It would further few of the purposes of the Act to allow unions and employers to bargain for terms of employment that state law forbids employers to establish unilaterally. "Such a rule of law would delegate to unions and unionized employers the power to exempt themselves from whatever state labor standards they disfavored." *Allis-Chalmers*

*Corp.* v. *Lueck, ante,* at 212.   It would turn the policy that animated the Wagner Act on its head to understand it to have penalized workers who have chosen to join a union by preventing them from benefiting from state labor regulations imposing minimal standards on nonunion employers.

## D

Most significantly, there is no suggestion in the legislative history of the Act that Congress intended to disturb the myriad state laws then in existence that set minimum labor standards, but were unrelated in any way to the processes of bargaining or self-organization.   To the contrary, we believe that Congress developed the framework for self-organization and collective bargaining of the NLRA within the larger body of state law promoting public health and safety.   The States traditionally have had great latitude under their police powers to legislate as "'to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Slaughter-House Cases,* 16 Wall. 36, 62 (1873), quoting *Thorpe* v. *Rutland & Burlington R. Co,* 27 Vt. 140, 149 (1855).   "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State.   Child labor laws, minimum and other wage laws, laws affecting occupational health and safety . . . are only a few examples." *De Canas* v. *Bica,* 424 U. S. 351, 356 (1976).   State laws requiring that employers contribute to unemployment and workmen's compensation funds, laws prescribing mandatory state holidays, and those dictating payment to employees for time spent at the polls or on jury duty all have withstood scrutiny.   See, *e. g., Day-Brite Lighting, Inc.* v. *Missouri,* 342 U. S. 421 (1952).

Federal labor law in this sense is interstitial, supplementing state law where compatible, and supplanting it only when it prevents the accomplishment of the purposes of the federal Act.   *Hines* v. *Davidowitz,* 312 U. S. 52, 67, n. 20 (1941); *Electrical Workers* v. *Wisconsin Employment Relations*

*Bd.*, 315 U. S. 740, 749–751 (1942); *Malone* v. *White Motor Corp.*, 435 U. S., at 504. Thus the Court has recognized that it "cannot declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions; obviously, much of this is left to the States." *Motor Coach Employees* v. *Lockridge*, 403 U. S. 274, 289 (1971). When a state law establishes a minimal employment standard not inconsistent with the general legislative goals of the NLRA, it conflicts with none of the purposes of the Act. "A holding that the States were precluded from acting would remove the backdrop of state law that provided the basis of congressional action . . . and would thereby artifically *create* a no-law area." *Taggart* v. *Weinacker's, Inc.*, 397 U. S. 223, 228 (1970) (concurring opinion) (emphasis in original).

Thus, in *Malone* v. *White Motor Corp.*, *supra*, the Court rejected a similar challenge to a pre-ERISA state pension Act which established minimum funding and vesting levels for employee pension plans. The Court found the law not pre-empted by the NLRA, in part for reasons relevant here:

> "There is little doubt that under the federal statutes governing labor-management relations, an employer must bargain about wages, hours, and working conditions and that pension benefits are proper subjects of compulsory bargaining. But there is nothing in the NLRA . . . which expressly forecloses all state regulatory power with respect to those issues, such as pension plans, that may be the subject of collective bargaining." 435 U. S., at 504–505.[32]

---

[32] The Court previously has addressed this same issue in the related context of the Railway Labor Act, 44 Stat. 577, as amended, 45 U. S. C. § 151 *et seq.*:

"The Railway Labor Act, like the National Labor Relations Act, does not undertake governmental regulation of wages, hours, or working conditions. Instead it seeks to provide a means by which agreement may be

Massachusetts' mandated-benefit law is an insurance regulation designed to implement the Commonwealth's policy on mental-health care, and as such is a valid and unexceptional exercise of the Commonwealth's police power. It was designed in part to ensure that the less wealthy residents of the Commonwealth would be provided adequate mental-health treatment should they require it. Though § 47B, like many laws affecting terms of employment, potentially limits an employee's right to choose one thing by requiring that he be provided with something else, it does not limit the rights of self-organization or collective bargaining protected by the NLRA, and is not pre-empted by that Act.

## V

We hold that Massachusetts' mandated-benefit law is a "law which regulates insurance" and so is not pre-empted by ERISA as it applies to insurance contracts purchased for plans subject to ERISA. We further hold that the mandated-benefit law as applied to a plan negotiated pursuant to a collective-bargaining agreement subject to the NLRA is not pre-empted by federal labor law.

The judgment of the Supreme Judicial Court of Massachusetts is therefore affirmed.

*It is so ordered.*

JUSTICE POWELL took no part in the decision of these cases.

---

reached with respect to them. The national interest expressed by those Acts is not primarily in the working conditions as such. . . .

"State laws have long regulated a great variety of conditions in transportation and industry . . . . But it cannot be that the minimum requirements laid down by state authority are all set aside. We hold that the enactment by Congress of the Railway Labor Act was not a preemption of the field of regulating working conditions themselves and did not preclude the State . . . from making the order in question." *Terminal Railroad Assn. v. Railroad Trainmen,* 318 U. S. 1, 6–7 (1943) (footnote omitted).