Gerrye PUGH, Jimmie Erskine, Albert Huston, Dorothy Reid, and James L. Woodall, as Trustees of the Laborers' Health and Welfare Trust Fund of South Florida, Plaintiffs,

v.

Frank WILSON, Jr., Defendant.

No. 88–0592–CIV.

United States District Court,
S.D. Florida,
Miami Division.

July 28, 1988.

Carmen Johnson, W. Russell Hamilton, III, Muller, Mintz, Kornreich, Caldwell, Casey, Crosland & Bramnick, P.A., Miami, Fla., for plaintiffs.

Herman M. Klemick, Miami, Fla., for defendant.

## MEMORANDUM OPINION AND ORDER

NESBITT, District Judge.

This case is before the court on cross-motions for summary judgment filed by the Plaintiffs, the Trustees of the Laborers' Health and Welfare Trust Fund of South Florida ("Trustees"), and by Defendant Frank Wilson, Jr. The case had been set for non-jury trial but was removed from the trial calendar when the cross-motions were filed. On May 26, 1988, this court entered an Order stating that the case would be heard on the cross-motions and any supplemental memoranda duly filed and consistent with the dictates of Fed.R. Civ.P. 56(c). Both the Trustees and Wilson filed supplemental memos in support of the pending motions. For the reasons hereinafter stated, this case is appropriate for disposition by summary judgment.

*Facts*

As set forth in the Trustees' Statement of Undisputed Facts in their Memorandum in Support of Plaintiffs' Motion for Summary Judgment filed on May 10, 1988, Defendant Wilson was an employee eligible to receive medical benefits from the Laborers' Health and Welfare Trust Fund of South Florida ("the Fund") under the terms of the Fund's plan of benefits. Wilson was injured in a motorcycle accident in August 1987 and incurred medical expenses of over $28,000, which the Fund paid. The Fund's benefits plan contains a subrogation clause; pursuant to that clause, the parties executed a Subrogation Agreement that requires Wilson to

> pay over to the Plan, to the extent of the amount of benefits paid by the Plan, all amounts recovered by suit, settlement, or otherwise from any party or insurance carrier ... as a result, directly or indirectly, of the events causing or contributing to the injuries sustained....

After his accident, Wilson hired an attorney who obtained a settlement of his claim against the other driver involved in the accident. The other driver's insurance carrier, State Farm, paid Wilson the amount of the policy limit, $25,000, in a check made out to Wilson and his attorney jointly. After deducting his fee and costs, the attorney gave Wilson a check for $15,-431.50. Wilson never obtained the Fund's written consent to the settlement, and he has refused to reimburse the Fund as required by the Subrogation Agreement.

The Trustees instituted this action to enforce the subrogation provision of the plan, which is an "employee benefit plan" as defined in the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). The Trustees also sought to enjoin Wilson from spending the money he had received from the settlement. After accelerated discovery, it became apparent that little, if any, of the settlement fund was left, and on April 6,

1988 this court issued a preliminary injunction enjoining Wilson from disbursing the settlement money or taking any actions inconsistent with the rights of the Fund under the Subrogation Agreement.

■ The Trustees filed a motion for summary judgment on May 10, 1988; within the time permitted by the Local Rules, Wilson filed a combined response to the Trustees' motion and his own motion for summary judgment. Although Wilson's memorandum in support of his combined response/motion states, "The facts in this case are reasonably clear ...," a motion for summary judgment by definition requires that no material facts are at issue or are less than "reasonably clear." As the Trustees point out, Wilson never contested their Statement of Undisputed Facts, which is therefore taken as true as provided by Local Rule 10(J)(2).[1] Nevertheless, in his supplemental memorandum, Wilson raises for the first time factual questions regarding payments made by the Trustees on his behalf. *See* Defendant's Additional Memorandum in Opposition to Plaintiff's Motion for Summary Judgment filed on June 9, 1988 at ¶ 2.

The court finds that despite Wilson's belated attempt to establish the existence of disputed facts, the case is ripe for resolution on the cross-motions for summary judgment. As stated above, the Trustees' Statement of Undisputed Facts went unchallenged, and Wilson himself filed a motion for summary judgment. Furthermore, Wilson offers only a statement by counsel in his supplemental memorandum to show that disputed facts remain to be litigated. Rule 56(e) of the Federal Rules of Civil Procedure provides that the party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 106

---

1. The court has been tolerant of defense counsel's apparent unfamiliarity with both the Local Rules of the Southern District of Florida and the Federal Rules of Civil Procedure.

S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Wilson has not indicated support for his assertion in either deposition testimony or answers to interrogatories, and offers only conclusory allegations in opposition to the affidavit of the fund's administrator. For these reasons, the court finds that there are no genuine issues of material fact left to be resolved at trial, and consideration of the cross-motions for summary judgment is therefore appropriate.

The issues presented by the cross-motions can be reduced to a two-part inquiry. First, does Florida's collateral source statute, Fla.Stat. § 627.7372, prevent the Trustees from recovering any of the settlement fund that Wilson received? If so, does ERISA preempt the collateral source statute as it applies to the fund?

### The Collateral Source Statute

■ Traditionally, the collateral source rule prohibits the introduction into evidence of compensation an injured party receives from a source other than the tortfeasor. Under this rule, a tortfeasor does not benefit from the fact that the injured person receives benefits from an insurance policy because those benefits will not be deducted from an award of damages. The Florida Legislature, however, has abrogated the traditional collateral source rule in the Florida Motor Vehicle No–Fault Law, Fla. Stat. §§ 627.730–627.7405. That statute provides in relevant part:

(1) In any action for personal injury ... arising out of the ownership, operation, use, or maintenance of a motor vehicle, the court shall admit into evidence the total amount of all collateral sources paid to the claimant, and the court shall instruct the jury to deduct from its verdict the value of all benefits received by the claimant from any collateral sources.

(2) For purposes of this section, "collateral sources" means any payments made to the claimant, or on his behalf, by or pursuant to:

\* \* \* \* \* \*

(c) Any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the costs of hospital, medical, dental, or other health care services.

Fla.Stat. § 627.7372. Defendant Wilson contends that the statute prevents the Trustees from recovering any of the settlement money he received.

The seminal case interpreting this section of the statute is *Blue Cross and Blue Shield of Florida, Inc. v. Matthews,* 498 So.2d 421 (Fla.1986). In *Matthews,* the Florida Supreme Court considered whether the statute bars the subrogation rights of a health care insurer, and found that it does not. The court stated, "[B]y its terms, section 627.7372 does not prohibit recovery under subrogation by the payor of collateral source benefits from the tortfeasor. Florida has long recognized the subrogation rights of an insurer to recover payments made to an insured for injuries which were caused by the tortfeasor." *Id.* at 422.

Unlike the factual setting of *Matthews,* however, this case involves the right of the insurer to recover directly from the injured person, rather than from the tortfeasor. The instant case also differs from *Matthews* because a settlement rather than an adversarial proceeding is involved. No Florida court has directly addressed the question of whether an insurer can recover settlement money received by an injured person who has signed a subrogation agreement.

Although Wilson cites several Florida District Court of Appeals decisions in support of his position, only one of those cases is post-*Matthews.* The pre-*Matthews* decisions that are on point rely on the logic behind the collateral source statute in holding that an insurer cannot sue an insured for reimbursement from a settlement fund. In theory, a settlement fund would never contain money for medical expenses because the tortfeasor knows he would not have to pay them if the case actually went to trial. Therefore, the settlement fund must represent damages other than medi-

cal expenses (which have been paid by the insurer), leaving nothing for the insurer to recover.

In dicta, the Third District Court of Appeals has noted that this logic still seems to apply even after the *Matthews* decision. *See Maglio v. NECA–IBEW Welfare Trust Fund,* 506 So.2d 447, 448 n. 1 (Fla.3d DCA 1987). The First District Court of Appeal was faced with the question on similar, but not identical, facts but declined to reach the issue on a motion for summary judgment because questions of fact remained about the meaning of some terms of the subrogation agreement. *See Avera v. Provident Security Life Ins. Co.,* 512 So.2d 292 (Fla. 1st DCA 1987). Because the question is an unsettled one involving interpretation of state law, the court is reluctant to speculate as to how the Florida courts would resolve the issue. However, the logic underlying the statute seems to indicate that an insurer is barred from pursuing a claim against the insured's settlement fund. Rather, as in *Matthews,* the insurer's remedy is to sue the tortfeasor directly.[2]

### ERISA Preemption

The Trustees argue that even if Florida's collateral source statute precludes their suit against Wilson, they still have a cause of action because ERISA preempts the state law. The scope of preemption under ERISA is a somewhat complicated determination because there are three separate components to the preemption section of the statute. *See* ERISA § 514, 29 U.S.C. § 1144. In *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) Justice O'Connor summarized the "pure mechanics" of the preemption provisions:

If a state law "relate[s] to ... employee benefit plan[s]," it is pre-empted.

§ 514(a). The saving clause excepts from the pre-emption clause laws that "regulat[e] insurance." § 514(b)(2)(A). The deemer clause makes clear that a state law that "purport[s] to regulate insurance" cannot deem an employee benefit plan to be an insurance company. § 514(b)(2)(B).

*Id.* 107 S.Ct. at 1552. As Justice Blackmun has described these sections, in an oft-quoted passage, the preemption provisions

while clear enough on their faces, perhaps are not a model of legislative drafting, for while the general pre-emption clause broadly preempts state law, the saving clause appears broadly to preserve the States' lawmaking power over much of the same regulation. While Congress occasionally decides to return to the States what it has previously taken away, it does not normally do both at the same time.

*Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 739–40, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985).

Under the first section of the statute, ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." § 514(a), 29 U.S.C. § 1144(a). The United States Supreme Court has found that Congress used the words "relate to" in their broad sense. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 98, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). The court concluded, "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Id.* *See also Metropolitan Life,* 471 U.S. at 739, 105 S.Ct. at 2388; *Pilot Life,* 107 S.Ct. at 1553. In this case, the Florida collateral source statute "relates to" the employee benefit plan administered by the Trustees because the statute has a

---

**2.** Plaintiffs urge this court to follow the decision rendered by Judge Gonzalez in *Michaud v. Laborers' Local Union 767 Health and Welfare Trust Fund,* unpub. order dated March 20, 1987. On almost identical facts, Judge Gonzalez found that the collateral source statute does not control settlements made prior to trial. Because the statute applies only in the event of trial, the insurer is not prevented from seeking reimbursement from a settlement fund. In light of the Florida cases discussed above, however, which were decided after *Michaud,* this court declines to follow Judge Gonzalez' opinion.

connection with the Plan's subrogation clause. Because the court has found that the collateral source statute would preclude enforcement of the subrogation agreement (entered into pursuant to the subrogation clause), the statute necessarily "relates to" the Plan and is therefore preempted by ERISA.

■■■ The second step of the analysis involves the so-called saving clause, § 514(b)(2)(A), which provides that state laws regulating insurance are "saved" from the broad preemption clause, § 514(a). In *Pilot Life* Justice O'Connor outlined the factors involved in determining whether a state law falls under the saving clause. *Pilot Life*, 107 S.Ct. at 1553 (citing *Metropolitan Life*, 471 U.S. at 740, 105 S.Ct. at 2389). Courts should take guidance first, from a common-sense view of the language of the saving clause, and second, from criteria used in interpreting the phrase "business of insurance" (as used in the McCarran–Ferguson Act, 15 U.S.C. § 1012(a)). *Id.* Those criteria are:

1. Whether the practice has the effect of transferring or spreading a policyholder's risk;

2. Whether the practice is an integral part of the policy relationship between the insurer and the insured; and

3. Whether the practice is limited to entities within the insurance industry.

*Id.* at 1553–54 (quoting *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129, 102 S.Ct. 3002, 3009, 73 L.Ed.2d 647 (1982)). Furthermore, "in order to regulate insurance, a law must not just have an impact on the insurance industry, but be specifically directed toward that industry." *Id.* 107 S.Ct. at 1554.

■■■ Applying these criteria and a common-sense view of the statutory language to the facts at hand, the court concludes that Florida's collateral source statute is not a law regulating insurance.[3] As part

of the state's Motor Vehicle No–Fault Law, the statute is simply a rule of evidence that requires the trial court to reduce a verdict by the amount of medical benefits already paid on the victim's behalf. In fact, the Florida Supreme Court has held that the statute does not affect the subrogation rights of an insurer. *See Blue Cross and Blue Shield of Fla., Inc. v. Matthews*, 498 So.2d 421 (Fla.1986). The collateral source statute does not affect the policyholder's risk because the insured will recover medical benefits from the insurer and damages from the tortfeasor; the statute prevents duplicative recovery. As a general rule of evidence, the statute does not involve the policy relationship between the insurer and the insured; similarly, the rule is not limited to the insurance industry but applies equally in all motor-vehicle accident cases. *See* Fla.Stat. § 627.7372.

In other similar cases cited by the parties, the state laws at issue were more clearly aimed at regulating insurance. For example, in *United Food & Commercial Workers & Employers Arizona Health & Welfare Trust v. Pacyga*, 801 F.2d 1157 (9th Cir.1986), Arizona common law prohibited assignment of prejudgment personal injury claims. The same was true of Missouri common law in *Davis v. Line Const. Benefit Fund*, 589 F.Supp. 146 (W.D.Mo. 1984). (The court in *Davis* stated that the saving clause was not "even arguably applicable" to the Missouri rule.) In *Dillard v. Teamsters Council 83 Health & Welfare Fund*, 6 Employee Benefit Cas. (BNA) 2558 (W.D.Va.1985), the Virginia Code expressly prohibited subrogation clauses in insurance contracts. And in *Northern Group Services, Inc. v. Auto Owners Ins. Co.*, 833 F.2d 85 (6th Cir.1987), Michigan's No–Fault Automobile Insurance Act required automobile insurers to offer coordination of benefits provisions.

■■■ Even if the collateral source statute were to be considered a law regulating

---

**3.** The court recognizes, however, that the statute is contained within Florida's Insurance Code, Fla.Stat. Title 37.

insurance by virtue of its placement in the Motor Vehicle No–Fault Law, it would still be preempted because of the so-called deemer clause, § 514(b)(2)(B). Under this third step of the ERISA preemption analysis, even a state law regulating insurance will be preempted as applied to self-insured employee benefit plans. The deemer clause provides that an employee benefit plan will not be deemed to be an insurance company for purposes of any state law regulating insurance. The Supreme Court recognized that a distinction therefore exists between plans that purchase insurance from a commercial company and those that are self-insured, "leaving the former open to indirect regulation while the latter are not." *Metropolitan Life*, 471 U.S. at 747, 105 S.Ct. at 2393. Because the Plan in this case is self-insured, it could not be deemed to be an insurance company for purposes of the collateral source statute, even if the statute were construed as a law regulating insurance.

*Conclusion*

The court finds that the collateral source statute as interpreted by the Florida courts is preempted by ERISA to the extent that it would preclude enforcement of the Plan's subrogation clause. For the above-stated reasons, it is therefore

ORDERED AND ADJUDGED that Plaintiffs' Motion for Summary Judgment is GRANTED, and Defendant's Cross–Motion for Summary Judgment is DENIED. By separate order, the court will enter Final Judgment in favor of Plaintiffs.