# DREXELBROOK ENGINEERING COMPANY

v.

# The TRAVELERS INSURANCE COMPANY, the Travelers Indemnity Company, and Provident Life and Accident Insurance Company.

Civ. A. No. 88–5483.

United States District Court, E.D. Pennsylvania.

March 29, 1989.

---

Mary Jo Corsetti, Philadelphia, Pa., for plaintiff.

Peter J. Hoffman, McKissock & Hoffman, P.C., Philadelphia, Pa., for the Provident Life and Acc. Ins. Co.

M. Duncan Grant, Pepper Hamilton & Scheetz, Susan Katz Hoffman, Philadelphia, Pa., for the Travelers Ins. Co., the Travelers Indem. Co.

## ADJUDICATION

VAN ANTWERPEN, District Judge.

In the instant matter, plaintiff seeks to recover from an insurance carrier who denied payment on a claim. At the non-jury trial on January 25, 1989, the parties stipulated to the following undisputed facts:

1. Plaintiff Drexelbrook Engineering Company ("Drexelbrook") is the assignee of the claims of one Robert E. Hay against defendants with respect to medical expenses incurred by Mr. Hay from January 31, 1987 to January 31, 1988.

2. Robert Hay, who is not a party to this action, was an employee of the SS White Company ("SS White") or its predecessors from 1974 until on or about September 15, 1986.

3. On or about September 15, 1986, Keystone X–Ray, Inc. ("Keystone") purchased the SS White Company, and Mr. Hay became a Keystone employee.

4. While employed by SS White, Mr. Hay was covered by the Group Life and Health Insurance Plan of the SS White Company ("the SS White Plan").

5. SS White was the administrator of the SS White Plan.

6. Mr. Hay received a copy of the Summary Plan Description for the SS White Plan in 1984, shortly after he became a participant in the SS White Plan.

7. The Travelers Insurance Company ("Travelers") issued Group Policies Nos. G 665624 and GA 665624 to SS White Company, which set forth certain benefits to be provided to covered employees under the SS White Plan and which set forth certain premiums for such benefits.

8. Prior to September 15, 1986, and at all relevant times, Mr. Hay was an eligible employee under the SS White Plan. Dur-

ing his employment period, the portion of the cost of the SS White Plan allocated to employees was deducted from Mr. Hay's salary.

9. On or about October 15, 1986, a representative of SS White told Mr. Hay that his coverage under the SS White Plan would continue only until January 31, 1987.

10. SS White continued Mr. Hay's group coverage under its health plan until January 31, 1987.

11. Mr. Hay was not given specific notification at the time of his termination of employment with SS White or at the time of the termination of his coverage under the SS White Plan regarding any rights under the Plan (if any) to convert his group coverage to individual coverage.

12. Mr. Hay had been diagnosed as having renal (kidney) failure by Dr. Serota on March 4, 1986. Mr. Hay was hospitalized at Abington Memorial Hospital for kidney failure from March 10, 1986 to March 14, 1986. Thereafter, Mr. Hay was diagnosed as having kidney failure and treated on a monthly basis from March, 1986 to January, 1987, when he was again hospitalized for kidney failure. Mr. Hay was hospitalized for kidney failure again in February, 1987 and then received medical advice and treatment for kidney problems on a monthly basis until the present time.

13. From January 31, 1987 through January 31, 1988, Mr. Hay was treated for a punctured lung and for kidney failure, and medical expenses were incurred as a result of such treatments. Medicare, Drexelbrook, and/or Drexelbrook's insurer, Mutual of New York reimbursed Mr. Hay for all of these expenses.

14. On January 1, 1987, Mr. Hay became covered by the group health plan of Keystone, which was insured at that time by Provident Life and Accident Insurance Company.

15. Mr. Hay was not shown the Keystone Summary Plan Description by Keystone until after January 1, 1987. He first saw the Plan around March, 1987 and had the opportunity to read it. He "paged through it."

16. From 1986 to the present, Mr. Hay has been covered as a dependent under the group health plan of his wife's employer, Drexelbrook Engineering Company.

17. Since April 1, 1987, Mr. Hay has also been covered by Medicare for a portion of the expenses related to kidney failure.

18. The SS White group policy covering Mr. Hay provided that insurance under the SS White Plan would terminate when the employee's employment terminated (p. 27).

19. The SS White group policy covering Mr. Hay provided for extended benefits after the termination of insurance (p. 31).

20. The Summary Plan Description of the SS White Plan, provided to Mr. Hay in 1984, contained a description of the conversion privilege under Group Policies G 665624 and GA 665624.

21. Mr. Hay never attempted to exercise the health conversion privilege, if any, provided under the SS White group policies. At his deposition, Mr. Hay stated that he had never read the page of the Summary Plan Description which describes the conversion privilege.

22. The Provident Life and Accident Insurance Company policy, which covered Mr. Hay as a Keystone employee after January 1, 1987, contained an exclusion as set forth on page 22 of Defendants' Exhibit 2.

23. The Travelers denied reimbursement for Mr. Hay's medical expenses incurred after January 31, 1987 on the ground that his coverage under the group policies of the SS White Company had expired by reason of the termination of coverage on January 31, 1987.

24. Provident refused to reimburse Mr. Hay or his health care providers for medical expenses related to kidney failure, except for $1,000, during the calendar year 1987, on the ground that these expenses were incurred for treatment of pre-existing conditions, which were excluded under the policy. Provident did, however, pay $1,000 during 1987 and also paid all covered medical expenses related to the hernia.

25. On January 28, 1988, Mr. Hay assigned to Drexelbrook Engineering Company all of his rights, title, and interest in all claims and causes of action against the SS White Company, the Travelers Insurance Company, the Travelers Indemnity Company, Keystone X–Ray, Inc., and Provident Life and Accident Insurance Company for reimbursement of medical expenses incurred from January 31, 1987 to January 31, 1988.

## DISCUSSION AND CONCLUSIONS OF LAW

As outlined in the findings of fact, this is a case in which one Robert E. Hay was employed by a company ("SS White") which in 1986 was purchased by another company ("Keystone"). While he was working for SS White, Mr. Hay was covered by a group health insurance plan administered by SS White. Shortly after Keystone took over, SS White told Mr. Hay that his existing group health insurance plan would terminate on January 31, 1987, but they did not tell him that he could convert the White group plan to individual coverage. On January 1, 1987, the new group health insurance of Keystone started covering Mr. Hay.

A physician diagnosed Mr. Hay as having kidney failure approximately six months before the Keystone takeover and treated him on a continuing basis. Keystone did not show Mr. Hay a written description of the Keystone Group Health Insurance Plan until after January 31, 1987, and only later he learned that the Keystone plan excluded pre-existing medical conditions. The insurance carrier[1] for SS White, the Travelers Insurance Company, has denied coverage of medical expenses incurred after January 31, 1987, and the insurance carrier which underwrote the Keystone plan, Provident Life and Accident Insurance Company, has denied coverage because of the pre-existing coverage exclusion. Fortunately, Mr. Hay was covered as a dependent under his wife's health plan with Drexelbrook. Drexelbrook paid his medical expenses and took an assignment of whatever rights Mr. Hay had against both insurance companies.

After the trial, but before we issued this decision, Provident and Drexelbrook resolved their dispute and entered into a formal settlement agreement. Thus, we need not address the issues raised by that controversy.

Drexelbrook argues that Travelers did not comply with state insurance law notice requirements contained in 40 Pa.Cons.Ann. § 756.2 (Purdon Supp.1988)[2] because it did not notify Robert Hay in writing of his conversion rights. Travelers responds, *inter alia*, that ERISA preempts the above state statutes and that it fully complied with the federal requirements.

The ERISA preemption provision provides as follows:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.

29 U.S.C. § 1144(a) (1982). The Supreme Court reads this as a broad preemption statute, *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 45–46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987), preempting any state law that does not fall within the savings clause of ERISA. *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). In subsection (b), the savings clause provides as follows:

> Except as provided in subparagraph (B) [the deemer clause], nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance....

29 U.S.C. § 1144(b)(2)(A). Congress further modified the savings clause with a

---

1. Our use of this term does not bear upon our analysis of the legal relationship between Travelers and SS White. Rather we use "insurance carrier" for convenience.

2. In pertinent part, the statute provides as follows: "Each certificate holder in the insured group shall be given written notice of [his] conversion privilege and its duration within fifteen days before or after the date of termination of group coverage...."

"deemer" provision which provides as follows:

> Neither an employee benefit plan ... nor any trust established under such a plan, shall be deemed to be an insurance company, ... for purposes of any law of any State purporting to regulate insurance companies [or] insurance contracts.

29 U.S.C. § 1144(b)(2)(B).

Drexelbrook contends that under ERISA Travelers is an insurance company, that the Pennsylvania state insurance laws apply to its participation in Robert Hay's benefit plans, and that the "savings clause" of ERISA precludes preemption of the state law claims. On the contrary, Travelers argues that the SS White Plan is a self-insured benefit plan which simply purchased stop-loss or excess coverage from Travelers, and thus under the deemer clause, the plan is not an insurance company for the purpose of ERISA preemption. Travelers also argues for ERISA preemption on the ground that the state laws at issue do not "regulate" insurance.

■ Following the dictates of *Metropolitan Life,* we will engage in a three-step analysis to determine whether ERISA preempts the state law claims at issue. We will inquire (1) whether the state laws relate to an employee benefit plan; (2) whether the state laws regulate insurance, banking, or securities such that under the savings clause state law will apply; and (3) whether, for preemption purposes, the deemer clause precludes our deeming the SS White Plan or Travelers to be an insurance company. 471 U.S. at 732–33, 105 S.Ct. at 2385. The parties do not dispute that the SS White Plan qualifies as an employee-benefit plan.

■ With respect to our first inquiry, in *Pilot Life,* the Supreme Court stated that a " 'law "relates to" an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.' " 481 U.S. at 47, 107 S.Ct. at 1553 (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2809–2900, 77 L.Ed.2d 490 (1983)). The Court further stated that Congress intended courts to apply the statutory words in the broadest sense. *Id.* The preemption clause is not limited to " 'state laws specifically designed to affect employee benefit plans.' " *Id.* (quoting *Shaw,* 463 U.S. at 98, 103 S.Ct. at 2900). Applying that standard, the Court held that common law causes of action based on alleged improper processing of an insurance claim "related to" the ERISA plan. Similarly in *Shaw,* the Court held that the New York Human Rights and Disability Benefits Law "related to" the ERISA plan. *See also United Food & Commercial Workers v. Pacyga,* 801 F.2d 1157, 1160 (9th Cir.1986) (Arizona antisubrogation law); *Eversole v. Metropolitan Life Insurance Co., Inc.,* 500 F.Supp. 1162 (C.D.Cal.1980) (breach of good faith, breach of fiduciary duty, and fraud laws). In the case at bar, Drexelbrook's claims against Travelers concerning its failure to notify Mr. Hay of his conversion rights clearly relates to an ERISA plan. There is a direct connection between the state laws at issue and the benefit plans; thus, the preemption clause comes into play.

ERISA instructs that we next inquire whether, under the savings clause, Drexelbrook's claim is based on any Pennsylvania state laws which regulate insurance. Because of our disposition of the deemer clause issue, however, we need not address the state law issues involving Travelers. Even if we were to find that those state laws regulated insurance, ERISA nevertheless would preempt such laws because, as we discuss below, we consider the SS White Plan self-insured.

■ We must thus inquire whether, under the deemer clause, the SS White Plan is self-insured. Plans may self-insure or they may purchase insurance for their members. State laws that regulate the insurance industry directly apply to plans that are underwritten by insurance companies while ERISA preempts such state laws where plans are self-insured. *Metropolitan Life,* 471 U.S. at 732, 105 S.Ct. at 2385. Thus, the deemer clause distinguishes "between insured and uninsured plans, leaving the former open to indirect regulation while the latter are not." *Id.* at 747, 105 S.Ct. at 2393.

■ In support of its argument that Travelers "insured" the SS White Plan, Drexelbrook cites the following facts: first, the SS White Summary Plan Description declares by its own terms that it is funded by the payment of premiums and that it provides benefits in accordance with group policies issued by Travelers;[3] second, in answer to paragraph five its complaint, Travelers admitted that "the SS White Plan was funded by the payment of premiums required by the insurance policies;" and third, Travelers was responsible for the grant or denial of benefits. Travelers admits that SS White did purchase some insurance from Travelers, but argues that it merely purchased "stop-loss" or excess insurance coverage, and thus for ERISA preemption purposes the plan remains self-insured.

In pertinent part, the agreement between Traveler's and SS White provides as follows:

WHEREAS, the Employer has established its "Health Benefit Plan" ...

WHEREAS, the Employer desires to establish its maximum liability under the Plan at a specified aggregate amount in any policy year and, to this end, desires that benefits payable under the Group Policies with respect to such classes of Employees and kinds of insurance in any policy year shall be the obligation of the Indemnity Company after, but only after, benefits payable by the Employer under the Plan reach said specified aggregate amount ...

The point in time ... at which the Indemnity Company's obligation to pay benefits from its funds shall commence ... [is] when benefits becoming payable in a Policy Year ... have been paid by or on behalf of the Employer in an Aggregate Amount determined for that Policy Year as follows:

The Aggregate Amount shall be equal to Sixty-seven per centum (67%) of the total amount of premiums which would have been payable under the Group Policies for such Policy Year for the kinds of insurance subject to this Agreement for the designated Employees if the Agreement had not been in effect....

The Indemnity Company shall have the right to make final determination of the amount of benefit, if any, to which an Employee shall be entitled in any claim for benefits accruing under the Plan ...

The Indemnity Company shall have no liability under the Group Policies for benefits required to be paid from the Employer's funds ... The Employer shall have no liability for benefits required to be paid from the Indemnity Company's funds ...

... [T]he premiums due under the Group Policies ... shall be equal to the sum of the products of

(1) the number of Employees then insured in each such class, and

(2) the factor applicable to such class, as shown in the Schedule of Premium Factors.

SCHEDULE OF PREMIUM FACTORS

| Classes of Employees | Factor |
| --- | --- |
| All Employees | Thirty-three per centum (33%) of the total amount of premiums which would have been payable under the Group Policies for such Policy Month for the kinds of insurance subject to this Agreement for the designated Employees if this Agreement had not been in effect. |

(Defendant's Exhibit 10). Travelers asserts that under this agreement the only premiums required by the insurance policies and the only benefits provided under the plan funded by those premiums were those in excess of the stop-loss limit. Travelers concedes that it processed the claims which did not in aggregate exceed the stop-loss limit, and that it even advanced pay-

---

**3.** The relevant provisions read as follows:
The Employer pays the premium under the group insurance policies partially from its funds and partially from funds contributed by Employees. The Employee's contribution is a fixed monthly rate as determined from time to time....

The Plan is funded by the payment of premium required by the insurance policies....
The Plan provides the following benefits ... described in detail in your group insurance certificate. (Defendant's Exhibit 3).

ments, but asserts that it did so subject to reimbursement by SS White. Thus, Travelers argues, SS White remains self-insured. Drexelbrook, on the other hand, characterizes this arrangement as one in which SS White purchased an insurance policy from Travelers to cover employee benefits; Drexelbrook concludes that the arrangement does not provide for excess insurance, but simply allows for a "set-off against the premiums."

In *Insurance Board of Bethlehem Steel Corp. v. Muir*, 819 F.2d 408 (3d Cir.1987), the court held that an insurer who sells administrative services to an ERISA plan does not engage in the business of insurance such that it would be subject to state regulation. The court cited the fact that Bethlehem Steel remained financially responsible for payments of benefits while Blue Cross and Blue Shield processed participant's claims, made initial determinations of coverage, and directly paid the claimants. *Id.* at 409. After applying the three-factor test derived from the McCarran–Ferguson Act, the court concluded that because of their administrative role, the Blues were not engaged in the business of insurance. Thus, under the deemer clause, ERISA preempted state law.

While the Third Circuit has not passed on the question whether an otherwise self-funded plan which takes out stop-loss coverage can still be considered self-funded, other courts have confronted the issue and have concluded that such plans remain self-funded. In *Cuttle v. Federal Employees Metal Trades Council*, 623 F.Supp. 1154, 1157 (D.C.Me.1985), the court defined stop-loss insurance: "Stop loss insurance is not group health insurance providing insurance to individuals through a sponsor group. Rather it is insurance obtained to protect self-insurers from risks beyond those upon which the premiums are based." The court held that plans which are primarily self-funded, but which carry stop-loss insurance, should not be considered regulable insurance companies. *Id.* Similarly, in *Moore v. Provident Life & Accident Insurance Company*, 786 F.2d 922, 927 (9th Cir.1986), the court considered self-funded a plan that purchased stop-loss coverage

that came into effect only when a specified aggregate amount of claims had been paid in a policy year. The member-employers of the plan contributed monthly to the fund, and these contributions were the sole assets of the plan. The insurance company did not provide any insurance to the plan beyond the stop-loss coverage. *See also United Food*, 801 F.2d at 1161; *Hutchinson v. Benton Casing Service, Inc.*, 619 F.Supp. 831, 838 (S.D.Miss.1985); *General Split Corp. v. Mitchell*, 523 F.Supp. 427, 431 (E.D.Wis.1981); *St. Paul Electrical Workers Welfare Fund v. Markman*, 490 F.Supp. 931 (D.Minn.1980).

In the case at bar, the agreement between SS White and Travelers provided for Travelers to administrate SS White's employee benefit plan; Travelers did not insure or underwrite the plan. In addition, SS White purchased stop-loss coverage from Travelers to come into effect after Travelers, on behalf of SS White, paid benefits above a specified aggregate amount. Despite some potentially misleading evidence to the contrary, the language of the agreement supports this conclusion. The agreement provides (1) that SS White wishes to "establish its maximum liability under the plan; (2) that Travelers' obligations to pay benefits *from its funds* shall commence when a specific amount of benefits have been paid; and (3) that Travelers shall have "no liability under the Group Policies for benefits required to be paid from the Employer's funds." This language clearly indicates that Travelers and SS White entered into a stop-loss arrangement.

We admit, however, that some of the language of the agreement creates confusion, especially when one engages with the formulas for determining premiums for stop-loss coverage and for determining the point at which the stop-loss benefits become available. The agreement calculates the premiums SS White must pay Travelers with reference to a certain percentage of premiums that SS White would pay Travelers in the absence of such an agreement. Similarly, the aggregate amount calculation also depends on those potential premi-

ums. Although these formulas refer to premiums which SS White would have paid under an ordinary group policy arrangement, they remain formulas; SS White does not pay premiums for group insurance coverage. SS White pays for an administrative service which provides benefits as it would if there were group insurance, but SS White, not Travelers, contributes the funds from which the benefits come.[4] After SS White pays a specified amount of benefits, then Travelers makes payments from its funds. Drexelbrook's other references to the language of the agreement, while superficially suggestive of an underwritten policy, do not defeat our conclusion. The fact that the agreement refers to group insurance policies (*See* Defendant's Exhibit 10) does not mean that SS White purchased ordinary group insurance. SS White self-insured its employees, but did so under a Travelers policy arrangement.

Drexelbrook also suggests that under *Muir* we must find that the SS White Plan is not self-insured because Travelers was engaged in the business of insurance. We do not dispute that if we apply the McCarran–Ferguson test to Travelers as an excess insurer, we must find them in the business of insurance; they are certainly not in the landscaping business. In this case, however, the McCarran–Ferguson test is not relevant. In *Muir* that test had obvious relevance. The Third Circuit faced the question whether an insurance carrier who is providing administrative services to an *entire* plan is engaging in the business of insurance. In the case at bar, however, we face the question whether an insurance carrier's providing excess insurance to a plan, that is, insuring a *portion* of the plan, destroys a plan's self-funded status; it is admitted that the insurance carrier is engaging in the business of insurance. Put simply, at issue in *Muir* was the classification of the activity itself, not the extent of obvious insurance activity. Thus, in the case at bar, we would reach a spurious conclusion if we asked the question wheth-

er an excess insurer is engaged in the business of insurance. Although Travelers engaged in the business of insurance, it did not do so with respect to the crux of the SS White Plan.

We find that Congressional intention also suggests that we adopt the Ninth Circuit approach and find that under ERISA self-funded plans which purchase stop-loss or excess insurance remain self-funded.

> In deciding whether a federal law preempts a state statute, our task is to ascertain Congress' intent in enacting the federal statute at issue. Preemption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.

*Metropolitan Life*, 471 U.S. at 738, 105 S.Ct. at 2388 (citations omitted). In enacting ERISA and specifically its preemption provisions, Congress intended to establish uniform regulation of benefit plans rather than subject benefit plans to myriad divergent state laws. Senate Comm. on Labor and Public Welfare, Employee Retirement Income Security Act of 1974, S.Rep. No. 93–127, 93rd Cong., 2nd Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 5188 (1974) (substantive and enforcement provisions of ERISA "are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans."). *See also Pilot Life*, 481 U.S. at 46, 107 S.Ct. at 1552. Thus, ERISA preempts state laws that might otherwise apply to self-funded plans. Because it is well known that most self-funded plans purchase some form of excess insurance to protect themselves from catastrophic loss, we find that Congress could not have intended that such protection would remove those plans from the umbrella of ERISA. Such a construction of ERISA would virtually emasculate the deemer clause, a result Congress clearly

---

**4.** SS White established a bank account with Connecticut National Bank solely for providing

benefits under its plan. (*See* Defendant's Exhibit 13).

could not have intended.[5]

We do not find relevant to our deemer clause analysis whether the stop-loss insurance had been triggered in the year at issue. Such an inquiry would lead to arbitrary and inconsistent results in an area in which Congress has sought uniformity. Although the Ninth Circuit in *Moore* and *Pacyga* noted that the stop-loss point had not been triggered, its analyses do not suggest that such fact was critical to their decisions. Furthermore, in *General Split, Hutchinson,* and *St. Paul,* the courts did not even address the question whether the stop-loss point had been reached. Whether the excess insurance becomes available in a given year simply does not affect the question whether the plan is essentially self-insured.[6] Thus, despite the potentially confusing nature of the agreement, under the dictates of *Muir,* and with the persuasive authority of the Ninth Circuit and various district courts, we consider the SS White Plan self-funded for purposes of ERISA preemption.

We must now direct our inquiry to the question whether Travelers fulfilled the ERISA notice requirements. ERISA requires that the insurer provide the insured with a Summary Plan Description:

Publication of the summary plan descriptions and annual reports shall be made to participants and beneficiaries of the particular plan as follows:

(1) The administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary, plan description, and all modifications and changes referred to in section 1022(a)(1) of this title—

(A) within 90 days after he becomes a participant, or (in the case of a beneficiary) within 90 days after he first receives benefits ...

29 U.S.C. § 1024(b)(1)(A). SS White furnished Mr. Hay with the summary plan

description which contained a complete description of the conversion policy rights under the plan. (*See* Defendant's Exhibit 3). This disclosure fully satisfied ERISA's requirements. Thus, Drexelbrook is not entitled to any recovery from Travelers. Judgment is for Defendant Travelers.

---

5. The Congressional intent to avoid subjecting benefit plans to conflicting state laws also precludes any simplistic approach which would favor our requiring notice merely because giving such notice is not an onerous duty compared to the benefit to an insured.

6. We do not deny that there could be a situation where the stop-loss limit is so artificially low such that we would consider the arrangement a sham. In the instant matter, however, we do not find that to be the case.