Long v. Hammond, 2002 NCBC 5

| | |
|---|---|
| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| WAKE COUNTY | 00-CVS-7097 |

| | |
|---|---|
| JAMES E. LONG, COMMISSIONER OF INSURANCE OF NORTH CAROLINA and LIQUIDATOR OF THE INTERNATIONAL WORKERS' GUILD HEALTH AND WELFARE TRUST FUND,<br><br>Plaintiff,<br><br>v.<br><br>CLAIR HAMMOND,<br><br>Defendant. | **<u>ORDER and OPINION</u>** |

{1}     This matter is before the Court pursuant to stipulation of the parties, Rule 57 of the North Carolina Rules of Civil Procedure, Business Court Local Rule 4.2, N.C.G.S. § 1-253 et seq., Defendant Clair Hammond's Motion to Dismiss on jurisdictional grounds, and the Joint Motion For Declaratory Ruling filed by both parties. The parties have requested that the Court enter a declaratory ruling with regard to two issues:

1. Is the International Workers' Guild and Health and Welfare Trust Fund required to be licensed under the provisions of Article 49 of Chapter 58 of the North Carolina General Statutes?

2. If the International Workers' Guild Health and Welfare Trust Fund is required to be licensed under the provisions of Article 49 of Chapter 58 of the North Carolina General Statutes, do the provisions of N.C.G.S. § 58-33-95 impose a standard of absolute strict liability on defendant for the contracts of insurance made by or through him, or must plaintiff show by a preponderance of the evidence constructive or actual knowledge of the unlawful activity?

{2}     For the reasons set forth below, the Court answers the first issue in the affirmative and determines that the statute imposes strict liability.

*E. Clementine Peterson, Assistant Attorney General, for the plaintiff.*
*Daniel R. Flebotte, for the defendant.*

{3}     This case is one of twenty-seven similar cases assigned to the Business Court arising out of the

liquidation of the International Workers' Guild Health and Welfare Trust Fund (the "IWG Fund"). The IWG Fund was a self-funded employee welfare benefit plan developed to pay health benefit claims of its participant employees and beneficiaries. James E. Long, Commissioner of Insurance of North Carolina, is the plaintiff, acting in his capacity as liquidator of the IWG Fund. In each case the defendant is a licensed insurance agent who acted as a representative for the IWG Fund and sold the plan's insurance to employers and employees in North Carolina. Clair Hammond was such an insurance agent. The IWG Fund is being liquidated and does not have sufficient funds to pay all the claims of its participants. The issues raised by the present motion for declaratory judgment and motion to dismiss are likely to arise in all of the cases and are central to the question of whether the insurance agents in North Carolina who represented the IWG Fund are strictly liable for the unpaid participants' claims. The Commissioner believes that they are strictly liable for the unpaid claims based upon the Fund's failure to obtain authorization to sell insurance in North Carolina, and Defendant Hammond contends that the North Carolina statutory scheme requiring authorization is preempted by ERISA and that if it is not, the Commissioner must show either actual or constructive knowledge of the unlawful nature of the insurance in order to hold an insurance agent liable for the unpaid claims. The answer to the first issue is dispositive with respect to the defendant's motion to dismiss for lack of jurisdiction. The answer to the second issue could be dispositive with respect to the merits of the Commissioner's claim if strict liability is imposed by the statutory scheme. Each issue requires a determination of law, not disputed fact. The parties have stipulated certain facts as uncontested for purposes of this motion. [1]

## I.

{4}     An understanding of the statutory classification of various benefit plans under the Employee Retirement Income Security Act of 1974 ("ERISA")[2] is critical to the outcome of issues in this case, and an understanding of the current status of the IWG Fund and other litigation involving the fund is helpful.

{5}     With the passage of ERISA, Congress imposed comprehensive federal oversight of employee benefit plans. The Act provides for express preemption of "any and all state laws insofar as they may now or hereafter relate to" employee benefit plans. 29 U.S.C. § 1144(a). In 1982, Congress amended ERISA to add two new partial exemptions from its express preemption. One of these exemptions

permits the states to regulate welfare benefit plans of a kind denominated "multiple employer welfare arrangements" ("MEWAs"). 29 U.S.C. 1144(b)(6). MEWAs are defined as any

> employee welfare benefit plan, or any other arrangement (other than an employee welfare benefit plan), which is established or maintained for the purpose of offering or providing any benefit described in paragraph (1) to the employees of two or more employers (including one or more self-employed individuals), or to their beneficiaries, except that such term does not include any such plan or other arrangement which is established or maintained--
> (i) under or pursuant to one or more agreements which the Secretary finds to be collective bargaining agreements,
>
> (ii) by a rural electric cooperative, or
>
> (iii) by a rural telephone cooperative association.

29 U.S.C. 1002(40)(A). North Carolina insurance law incorporates the definition of MEWAs set out in ERISA.[3]

{6}     There are several legal proceedings related to the IWG Fund. In December 1998, the U.S. Secretary of Labor brought suit against, among others, the National Association of Business Owners and Professionals ("NABOP"), IWG, and the IWG Fund in the Eastern District of New York, charging defendants with breaches of their fiduciary duties in administration of the IWG Fund. The federal district court granted the Secretary of Labor's request for preliminary injunction, which removed the trustees of the fund and the principals of IWG and NABOP from their positions, barred them from serving as fiduciaries or service providers to any other ERISA-covered plans, and froze the assets of the individuals and organizations with which they were affiliated. *Herman v. Fidelity Group, Inc.*, No. CV-98-7683 (E.D.N.Y. Dec. 24, 1998). That court also appointed attorney David Silverman as receiver for IWG and NABOP and as independent fiduiary to administer the Fund and determine whether it was economically viable. *Id.*

{7}     On January 29, 1999, the North Carolina Department of Insurance conducted an administrative proceeding to determine whether NABOP and IWG had been doing business as insurers, and soliciting and adjusting claims of North Carolina residents without first being issued a certificate of authority or appropriate license to carry on such activities. The Department of Insurance found that the IWG was subject to North Carolina insurance laws, that agents who marketed the insurance were personally liable on the Fund contracts they executed, and that the Fund was not preempted from State insurance regulation by ERISA. Defendant Hammond was not a party to that proceeding.

{8}     On March 29, 1999, the Wake County Superior Court entered an order of liquidation against the IWG Fund. *Commissioner of Insurance v. International Workers' Guild Health and Welfare Trust*

*Fund*, No. 99-CVS-2896.

{9}      On January 7, 2000, Independent Fiduciary David Silverman filed a supplemental complaint requesting a mandatory injunction to collect the assets of the IWG Fund and NABOP.  The suit included claims against persons, including Clair Hammond, who sold interests in the IWG Fund and received commissions based on premiums paid.

## II

{10}     The first issue the Court has been asked to resolve requires a determination of whether or not the IWG Fund is a MEWA and, if so, whether it was required to be licensed to sell insurance in North Carolina under N.C.G.S. § 58-49-35.  If the IWG Fund is not a MEWA, it is subject to the exclusive jurisdiction of the federal courts as provided by ERISA, and this Court and the Commissioner of Insurance have no jurisdiction over issues arising out of its administration.  If it is a MEWA, there is concurrent jurisdiction in federal and state courts over issues arising out of its administration.

{11}     The North Carolina statutory scheme is straightforward.  If a person and/or entity provides coverage in the State for medical, surgical, chiropractic or physical therapy treatment, they are presumed to be subject to the Commissioner's jurisdiction unless they can show that while doing so they were subject to the exclusive jurisdiction of the federal government or some other state agency.[4]  N.C.G.S. § 58-49-5.  The statutes also provide the means by which such persons can establish the exclusive jurisdiction of another agency.  Section 58-49-10 provides that a person claiming exemption by virtue of the exclusive jurisdiction of the federal government may establish that exclusive jurisdiction by providing the appropriate certificate, license or other document issued by the federal government or, alternatively, a certification by an official of the relevant federal agency that states that the person is under the exclusive jurisdiction of the federal agency.  In this case, the appropriate agency would be the United States Department of Labor.  If Hammond is unable to establish that the IWG Fund was subject to exclusive jurisdiction of the federal government, the Fund was subject to all appropriate provisions of Chapter 58 regarding the conduct of its business.  *See* N.C.G.S. § 58-49-20.

{12}     The Attorney General argues first that the Commissioner has already made a determination that the IWG Fund was a MEWA and that his determination is entitled to deference from this Court, citing *In re Broad & Gales Creek Community Ass'n*, 300 N.C. 267, 266 S.E.2d 645 (1980).  In the administrative hearing described above the Commissioner specifically found that the IWG Fund was

not subject to the exclusive jurisdiction of the Department of Labor. The Administrative Order contained the following Conclusion of Law:

> The Parties have not complied with the provisions of N.C.G.S. § 58-49-10 in that they were unable to provide to the Commissioner an appropriate certificate, license or document issued by the USDOL that permits the Fund to provide the medical services and benefits under the Fund, or a certification from an official of USDOL that states that the Fund was subject to its exclusive jurisdiction. Consequently, pursuant to N.C.G.S. § 58-49-20, all parties are subject to all of the appropriate provisions of Chapter 58 of the General Statutes of North Carolina regarding the conduct of their business.

{13}  Defendant was not a party to the administrative proceeding and is therefore not bound by it. Nor is the Court bound by the Commissioner's determination. Our Supreme Court in *In re Broad & Gales Creek Community Ass'n* simply held that "[f]inal interpretation of statutory terms is, of course, a judicial function, but definitions and interpretations of the statute by the agency with the expertise in administering it are entitled to due consideration by the courts." *Id.* at 275, 266 S.E.2d at 651.

{14}  The Court has fully considered the conclusion reached by the Commissioner but ultimately must make its own interpretation of the statute, particularly in light of the fact that defendant was not a party to the administrative proceeding.

{15}  In summary, the Court has concluded that if the Fund was a MEWA it was not exempt from state regulation under ERISA and was, therefore, required to be licensed under Article 49 of Chapter 58 of the General Statutes. It was a MEWA if it did not fit within the exception to the definition of MEWA for agreements "which the Secretary finds to be collective bargaining agreements." The Fund did not fit within that exception for two reasons. First, there has been no finding by the Secretary of Labor that the fund was established as part of a bona fide collective bargaining agreement. Rather, every public position taken by the Secretary appears to indicate the contrary. Second, based upon the facts before the Court on these motions, the Court has independently determined that the fund was not established as part of a bona fide collective bargaining agreement, but instead as a means to sell insurance. The Court does not believe that Defendant Hammond disagrees with the first conclusion stated above, but will address it briefly. The second conclusion is the principal area of disagreement between the parties.

A

{16}  States clearly have the right to regulate MEWAs that meet the statutory definition set out in the 1982 amendments to ERISA exempting state regulation of these entities from federal preemption. See 29 U.S.C. § 1144(b)(6) (quoted above in section two). Congress has, however, limited this

exemption. The extent to which a state may regulate MEWAs hinges upon whether the plan is fully or less than fully insured. Fully insured arrangements are subject to less state regulation than uninsured ones.[5] Where the subject of regulation is an ERISA-covered MEWA that is not fully insured, "any law of any state which regulates insurance may apply to the extent not inconsistent with the preceding sections of this subchapter." 29 U.S.C. § 1144(b)(6)(A)(ii).

{17} The IWG Fund did not purchase insurance for its participants but rather was self-insured. The Fund, therefore, was not fully insured pursuant to 29 U.S.C. § 1144(b)(6)(D). Also, defendant has not shown that any provisions of North Carolina law are inconsistent with ERISA. The U.S. Supreme Court has held that there is a presumption against preemption, absent a showing to the contrary. *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 741 (1985). There is no evidence that North Carolina's licensing and other regulations pertaining to MEWAs are at all inconsistent with ERISA.

B

{18} Defendant contends, however, that the IWG Fund is subject to an additional MEWA exception provided for in ERISA against plans established or maintained under a collective bargaining agreement. Under ERISA, MEWA "does not include any such plan or other arrangement which is established or maintained—(i) under or pursuant to one or more agreements which the Secretary finds to be collective bargaining agreements." 29 U.S.C. § 1002 (40)(A)(i).

{19} Defendant contends that the determination of whether a particular document is the product of good faith bargaining between bona fide employee representatives and one or more employers can be made only on an examination of the relevant facts and that this is the job of the Department of Labor, not the North Carolina Superior Court. (Def.'s Br. at 14.) The Court disagrees. This Court must determine whether or not the exemption applies in order to determine if the state can regulate the IWG Fund. The parties have stipulated:

> As of today's date neither the United States Department of Labor and any subsection thereof nor any specific secretary or assistant secretary or other authorized official has made any official determination as to whether the IWG Fund was properly established an ERISA Plan entitling it to preemption from state regulation, or that the IWG Fund was a Multiple Employer Welfare Arrangement (MEWA).

(Stipulation 35.)

{20} In the absence of any direct official action by the Department of Labor, the Court must make the required determination in order to resolve the question of whether the State of North Carolina can regulate the IWG Fund. That analysis begins with the collective bargaining agreement itself, two copies of which were submitted to the Court under tab 2 of the Joint Exhibits.

{21} The agreement purports to be a collective bargaining agreement on its face. It is executed by the union and NABOP on behalf of its employer members. Its terms deal primarily with the employee participation in the insurance program. It does on its face address holidays, vacation and sick pay. However, those provisions do nothing more than normal. For example, the holidays are limited to New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. There is a grievance procedure; however, it designates Burt Rose, an individual with an unknown address, as arbitrator and identifies a default grievance procedure under the New Jersey State Employment Relations Board (Article 11). North Carolina employees are not likely users of such a process. Article 7 provides that the employer can require total contributions from the employees for health insurance. It is difficult to find any benefit to employees from this "collective bargaining" agreement that most employers do not already provide. The terms are boiler plate provisions. It appears from Article 12 that only employees who signed up for insurance coverage would join the union. Although it provides for a "Membership Fee" only those employees who had agreed to pay union dues were subject to the check off. Presumably those employees were the same ones who elected to purchase the insurance coverage.

{22} Nor is there any indication that the provisions of the collective bargaining agreement were ever used by the employees of NABOP employers. There is no indication in this record of any grievance procedure ever being held under the agreement, nor any other action on behalf of an employee that was not related to the insurance program. As far as this record reveals, no bargaining sessions took place, nor does it appear that the union took any action to see that the unpaid insurance claims of its members were satisfied.

{23} The manner in which the "arrangement" originated is also indicative of the absence of a bona fide collective bargaining agreement. The parties have stipulated:

> In around 1995 certain persons in New York formed legal entities for the purpose of providing health care benefits to employees who participated in an arrangement they created that purported to be a multiple employer plan.
>
> These persons made contact with an existing and established labor union called International Workers Association.
>
> These persons created an arrangement between an organization they created called the National Association of Business Owners and Professionals (NABOP) and the International Workers Guild, aka International Workers Association (IWG).
>
> An arrangement was made in which people seeking health care benefits would be allowed to join the IWG and would be provided health care benefits through the administration of a third-party trust called International Guild Health and Welfare Trust Fund (IWG Fund).
>
> The arrangement provided in part that employers would join the purported collectively

bargained agreement prepared by the organizers of the arrangement with the labor union and NABOP. The essence of the plan was that the employers would join NABOP and the employees would join IWG. All parties would agree to bind themselves to the purported collectively bargained agreement that was already negotiated by the organizers of this arrangement.

. . . .

The organizers and creators of this arrangement approached North Carolina insurance agents to market this plan.

. . . .

Clair Hammond attended several marketing meetings in which the arrangement was presented to him as an opportunity to provide health care benefits to citizens of North Carolina."

(Stipulations 6,7,8,9,10, 14 and 16.)

{24}    The plan was self-funded, not insured. It was marketed by insurance agents who were paid commissions. There was no commonality among employers or employees. The "collective bargaining agreement" was ancillary to the commercial sale of health care insurance and not a benefit negotiated as part of a true collective bargaining process. As such, this arrangement falls within the description of plans determined not to be bona fide collective bargaining arrangements by the Secretary of Labor. Proposed regulation 2510.3-40(c) addresses the types of arrangements which the Secretary would exclude from the exemption for collectively bargained agreements and includes therein arrangements that are commercial schemes where a self-insured fund is marketed by insurance agents. The example provided closely resembles the situation here. It states:

> [s]uch a scheme might be present, for example, if parties who collaborate in a project to sell self-funded health coverage to otherwise unrelated members of the public set up an organization that they label a labor union, advertise broadly in commercial venues and have people who pay premiums sign forms that are labeled "union membership cards."

2510.3-40(c)(2).

{25}    In fact, the Secretary of Labor has filed pleadings in other actions in which she took the position that the IWG Fund was a MEWA. (Herman Compl. at ¶ 9 (Pl.'s Ex. 6).) The definition of MEWA does not include an arrangement entered into as part of a bona fide collective bargaining agreement, hence, the Secretary must have determined that the agreement covering the IWG Fund was not a bona fide agreement. It is clear that the Secretary of Labor has not made a specific finding that the agreement between NABOP and IWG was a bona fide collective bargaining agreement. *See* Letter from Dep't of Labor to Vincent C. Wiegand, Georgia Office of Ins. and Safety Fire Comm'r (March 5, 1999) 1999 ERISA LEXIS 6 (advising that the Department of Labor has "not issued a finding that the IWG Fund was established or is maintained under or pursuant to one or more agreements that the Department has determined to be collective bargaining agreements for purposes of ERISA section

3(40)"); Letter from U.S. Dep't of Labor to Anthony Caporale, Connecticut Ins. Dep't (Sept. 24, 1998), 1998 ERISA LEXIS 27 (same).   Absent that affirmative finding, the IWG Fund would be a MEWA.

{26}   Since the IWG Fund was a MEWA, it is subject to state regulation and it should have obtained a license issued by the commissioner.  Without that license it was not authorized to do business in North Carolina.

### III

{27}   The second issue which the parties have asked the Court to address  derives from the finding that the IWG Fund was not authorized to do business in North Carolina as required by the statute. The Court is concerned here only with the civil remedies provided in N.C.G.S. § 58-33-95 for failure to obtain the statutorily required authorization.  It states in pertinent part: "Any person representing an insurer is personally liable on all contracts of insurance unlawfully made by or through him, directly or indirectly, for any company not authorized to do business in the State."

{28}   The Commissioner urges the Court to read the statute literally and impose strict liability on Clair Hammond and the other agents who sold the insurance contracts in North Carolina.  Hammond urges the Court to read the statute to contain a requirement that the agent knew or should have known of the unauthorized status of the insurer before liability attaches to the agent.[6]

{29}   The application of the civil penalty in  the statute has not been addressed  by the appellate courts in  North Carolina.  Interpreting the statute to determine whether it imposes strict liability or a lesser standard requires examination of both the language of the statute and the public policies embodied in it.

{30}   The language of the statute is clear and unambiguous.  The imposition of liability is unconditional and encompassing.  It speaks of unlawful contracts made "by or through" the agent either "directly or indirectly" for any company not authorized to do business in the State.  It would have been a simple matter for the Legislature to add language so that the statute read "for any company which the agent knew or should have known was not authorized to do business in the State."  It did not do so.  This Court should not engraft such language on the statutory provision where the original language is clear

and unambiguous. *See Begley v. Employment Comm'n*, 50 N.C. App. 432, 274 S.E.2d 370 (1981).

{31}   The public policy underpinning the statute supports such an interpretation. The State has an interest in assuring that companies selling insurance within its borders obtain authorization where it is required. The State also has an interest in protecting the consumers of insurance products. It does so most effectively when it can grant or withhold a license. By placing the burden on agents selling the insurance to see that the companies they are representing are in compliance with the law, the State furthers its goals. Where consumers/insureds lose their benefits when unauthorized companies fail to pay their legitimate claims, the State has elected to place the burden of that failure on the agent rather than the insured because the agent was in a better position than the insured to determine if the company was lawfully doing business in the state. Consumers, particularly in plans such as that offered by IWG, have little knowledge of the licensing requirements and virtually no way to protect themselves. Agents on the other hand are more sophisticated and should know if the company they represent is licensed. If it is not, they know they are taking some risk in selling the product and have some obligation to determine if the company should be licensed. Where, as here, the agents themselves may have been misled by the company, the State has elected to place the burden of the failure to pay the claims on the agents who sold the product and received commissions rather than the consumers who have paid premiums and relied on the existence of coverage. That allocation is fair.

{32}   In summary, both the language of the statute and the policies which underlie it support an interpretation imposing strict liability on agents who sell policies for unauthorized companies, even if they did not know that the company should have been licensed by the Commissioner. The case law from other jurisdictions supports such an interpretation as well. *See, e.g., Brainard v. Foster*, 1992 U.S. Dist. LEXIS 3196; *McBride v. Rinard*, 172 Pa. 542, 33 A. 750 (1895); *Barnett v. Matthews*, 16 Ala. App. 385, 77 S. 965 (1918). The Court's interpretation is also in accord with the Commissioner's prior interpretation of the statute.


IV


{33}   For the forgoing reason, Defendant's Motion to Dismiss is denied. The Court concludes that the IWG Fund was required to be licensed under the provisions of Article 49 of Chapter 58 of the North Carolina General Statutes and that N.C.G.S. § 58-33-95 imposes a standard of strict liability on agents who wrote IWG Fund contracts of insurance.

SO ORDERED, this 22nd day of July 2002.

Ben F. Tennille
Special Superior Court Judge
for Complex Business Cases

## CERTIFICATION

{34}    Pursuant to Rule 54 of the North Carolina Rules of Civil Procedure, the Court certifies that there is no just reason for delay in entering this Order or the appeal therefrom. The Court notes that the determination of these issues on appeal will, in all probability, affect the disposition of the other twenty-seven cases currently pending.

This 22nd day of July 2002.


Ben F. Tennille
Special Superior Court Judge
for Complex Business Cases

---

[1] Rather than recite those stipulations verbatim, each fact relied upon will be identified where relevant.

[2] Pub. L. No. 93-406, 88 Stat. 829 (codified as amended in scattered sections of 5, 18, 26, 29, 31 & 42 U.S.C.)

[3] N.C.G.S. § 58-49-30. The statute provides that:
  (a) As used in this section, the term "multiple employer welfare arrangement" or "MEWA" means that term as defined in Section 3 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1002(40)(A), as amended, that meets either or both of the following criteria:
    (1) One or more of the employer members of the MEWA is either domiciled in this State or has its principal headquarters or principal administrative office in this State.
    (2) The MEWA solicits an employer that is domiciled in this State or that has its principal headquarters or principal administrative office in this State.

[4] For purposes of this case, Defendant Hammond asserts that the exclusive jurisdiction is federal and not that of any other state agency. Therefore, the opinion will refer only to exclusive federal jurisdiction in order to simplify the discussion of the issues.

[5] Under ERISA:

  (6) (A) Notwithstanding any other provision of this section—

  (i) in the case of an employee welfare benefit plan which is a multiple employer welfare arrangement and is fully insured (or which is a multiple employer welfare arrangement subject to an exemption under subparagraph (B)), any law of any State which regulates insurance may apply to such arrangement to the extent that such law provides--
  (I) standards, requiring the maintenance of specified levels of reserves and specified        levels of contributions,

which any such plan, or any trust established under such a plan, must meet in order to be considered under such law able to pay benefits in full when due, and (II) provisions to enforce such standards, and

(ii) in the case of any other employee welfare benefit plan which is a multiple employer welfare arrangement, in addition to this title, any law of any State which regulates insurance may apply to the extent not inconsistent with the preceding sections of this title.

29 U.S.C. § 1144(b)(6)(A).


[6] The Court is concerned here only with the civil penalty, and no determination of the requirements for imposition of criminal liability is at issue.